CALIFORNIA RETAIL LIQUOR DEALERS ASSN. *v.*
MIDCAL ALUMINUM, INC., ET AL.

No. 79–97. Argued January 16, 1980—Decided March 3, 1980

PowELL, J., delivered the opinion of the Court, in which all other Members joined, except BRENNAN, J., who took no part in the consideration or decision of the case.

*William T. Chidlaw* argued the cause and filed briefs for petitioner.

*Jack B. Owens* argued the cause for respondent Midcal Aluminum, Inc. With him on the brief were *Elliot S. Kaplan* and *Frank C. Damrell, Jr.*

*George J. Roth,* Deputy Attorney General of California, argued the cause for the State of California as *amicus curiae* urging reversal. With him on the brief was *George Deukmejian,* Attorney General.*

*\*W. Curtis Sewell* filed a brief for the Virginia Beer Wholesalers Association as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General McCree, Assistant Attorney General Shenefield, Deputy Solicitor General Wallace, Elinor Hadley Stillman, Barry Grossman, Ron M. Landsman,* and

Mr. Justice Powell delivered the opinion of the Court.

In a state-court action, respondent Midcal Aluminum, Inc., a wine distributor, presented a successful antitrust challenge to California's resale price maintenance and price posting statutes for the wholesale wine trade. The issue in this case is whether those state laws are shielded from the Sherman Act by either the "state action" doctrine of *Parker* v. *Brown,* 317 U. S. 341 (1943), or § 2 of the Twenty-first Amendment.

## I

Under § 24866 (b) of the California Business and Professions Code, all wine producers, wholesalers, and rectifiers must file fair trade contracts or price schedules with the State.[1]  If a wine producer has not set prices through a fair trade contract, wholesalers must post a resale price schedule for that producer's brands. § 24866 (a). No state-licensed wine merchant may sell wine to a retailer at other than the price set "either in an effective price schedule or in an effective fair trade contract. . . ." § 24862 (West Supp. 1980).

The State is divided into three trading areas for administration of the wine pricing program. A single fair trade contract or schedule for each brand sets the terms for all wholesale transactions in that brand within a given trading area. §§ 24862, 24864, 24865 (West Supp. 1980). Similarly, state

---

*Michael N. Sohn* for the United States; and by *A. Kirk McKenzie* for Consumers Union of United States, Inc.

[1] The statute provides:

"Each wine grower, wholesaler licensed to sell wine, wine rectifier, and rectifier shall:

"(a) Post·a schedule of selling prices of wine·to retailers or consumers for which his resale price is not governed by a fair trade contract made by the person who owns or controls the brand.

"(b) Make and file a fair trade contract and file a schedule of resale prices, if he owns or controls a brand of wine resold to retailers or consumers." Cal. Bus. & Prof. Code Ann. § 24866 (West 1964).

regulations provide that the wine prices posted by a single wholesaler within a trading area bind all wholesalers in that area. *Midcal Aluminum, Inc.* v. *Rice,* 90 Cal. App. 3d 979, 983–984, 153 Cal. Rptr. 757, 760 (1979). A licensee selling below the established prices faces fines, license suspension, or outright license revocation. Cal. Bus. & Prof. Code Ann. § 24880 (West Supp. 1980).[2] The State has no direct control over wine prices, and it does not review the reasonableness of the prices set by wine dealers.

Midcal Aluminum, Inc., is a wholesale distributor of wine in southern California. In July 1978, the Department of Alcoholic Beverage Control charged Midcal with selling 27 cases of wine for less than the prices set by the effective price schedule of the E. & J. Gallo Winery. The Department also alleged that Midcal sold wines for which no fair trade contract or schedule had been filed. Midcal stipulated that the allegations were true and that the State could fine it or suspend its license for those transgressions. App. 19–20. Midcal then filed a writ of mandate in the California Court of Appeal for the Third Appellate District asking for an injunction against the State's wine pricing system.

The Court of Appeal ruled that the wine pricing scheme restrains trade in violation of the Sherman Act, 15 U. S. C. § 1 *et seq.* The court relied entirely on the reasoning in *Rice* v. *Alcoholic Beverage Control Appeals Bd.,* 21 Cal. 3d 431, 579 P. 2d 476 (1978), where the California Supreme Court struck down parallel restrictions on the sale of distilled liquors. In that case, the court held that because the State played only a passive part in liquor pricing, there was no *Parker* v. *Brown* immunity for the program.

> "In the price maintenance program before us, the state plays no role whatever in setting the retail prices. The

---

[2] Licensees that sell wine below the prices specified in fair trade contracts or schedules also may be subject to private damages suits for unfair competition. § 24752 (West 1964).

prices are established by the producers according to their own economic interests, without regard to any actual or potential anticompetitive effect; the state's role is restricted to enforcing the prices specified by the producers. There is no control, or 'pointed re-examination,' by the state to insure that the policies of the Sherman Act are not 'unnecessarily subordinated' to state policy." 21 Cal. 3d, at 445, 579 P. 2d, at 486.

Rice also rejected the claim that California's liquor pricing policies were protected by § 2 of the Twenty-first Amendment, which insulates state regulation of intoxicating liquors from many federal restrictions. The court determined that the national policy in favor of competition should prevail over the state interests in liquor price maintenance—the promotion of temperance and the preservation of small retail establishments. The court emphasized that the California system not only permitted vertical control of prices by producers, but also frequently resulted in horizontal price fixing. Under the program, many comparable brands of liquor were marketed at identical prices.[3] Referring to congressional and state legislative studies, the court observed that resale price maintenance has little positive impact on either temperance or small retail stores. See infra, at 112–113.

In the instant case, the State Court of Appeal found the analysis in Rice squarely controlling. 90 Cal. App. 3d, at 984, 153 Cal. Rptr., at 760. The court ordered the Department of Alcoholic Beverage Control not to enforce the resale price maintenance and price posting statutes for the wine trade. The Department, which in Rice had not sought certiorari from

---

[3] The court cited record evidence that in July 1976 five leading brands of gin each sold in California for $4.89 for a fifth of a gallon, and that five leading brands of Scotch whiskey sold for either $8.39 or $8.40 a fifth. Rice v. Alcoholic Beverage Control Appeals Bd., 21 Cal. 3d, at 454, and nn. 14, 16, 579 P. 2d, at 491–492, and nn. 14, 16.

this Court, did not appeal the ruling in this case.[4]  An appeal was brought by the California Retail Liquor Dealers Association, an intervenor.[5]  The California Supreme Court declined to hear the case, and the Dealers Association sought certiorari from this Court.  We granted the writ, 444 U. S. 824 (1979), and now affirm the decision of the state court.

## II

The threshold question is whether California's plan for wine pricing violates the Sherman Act.  This Court has ruled consistently that resale price maintenance illegally restrains trade.  In *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373, 407 (1911), the Court observed that such arrangements are "designed to maintain prices . . . , and to prevent competition among those who trade in [competing goods]."  See *Albrecht* v. *Herald Co.*, 390 U. S. 145 (1968); *United States* v. *Parke, Davis & Co.*, 362 U. S. 29 (1960); *United States* v. *A. Schrader's Son, Inc.*, 252 U. S. 85 (1920). For many years, however, the Miller-Tydings Act of 1937 permitted the States to authorize resale price maintenance. 50 Stat. 693.  The goal of that statute was to allow the States to protect small retail establishments that Congress thought might otherwise be driven from the marketplace by large-volume discounters.  But in 1975 that congressional permission was rescinded.  The Consumer Goods Pricing Act of 1975, 89 Stat. 801, repealed the Miller-Tydings Act and related legislation.[6]  Consequently, the Sherman Act's ban on resale price

---

[4] The State also did not appeal the decision in *Capiscean Corp.* v. *Alcoholic Beverage Control Appeals Bd.*, 87 Cal. App. 3d 996, 151 Cal. Rptr. 492 (1979), which used the analysis in *Rice* to invalidate California's resale price maintenance scheme for retail wine sales to consumers.

[5] The California Retail Liquor Dealers Association, a trade association of independent retail liquor dealers in California, claims over 3,000 members.

[6] The congressional Reports accompanying the Consumer Goods Pricing Act of 1975 noted that repeal of fair trade authority would not alter

maintenance now applies to fair trade contracts unless an industry or program enjoys a special antitrust immunity.

California's system for wine pricing plainly constitutes resale price maintenance in violation of the Sherman Act. *Schwegmann Bros.* v. *Calvert Corp.,* 341 U. S. 384 (1951); see *Albrecht* v. *Herald Co., supra; Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons,* 340 U. S. 211 (1951); *Dr. Miles Medical Co.* v. *John D. Park & Sons Co., supra.* The wine producer holds the power to prevent price competition by dictating the prices charged by wholesalers. As Mr. Justice Hughes pointed out in *Dr. Miles,* such vertical control destroys horizontal competition as effectively as if wholesalers "formed a combination and endeavored to establish the same restrictions . . . by agreement with each other." 220 U. S., at 408.[7] Moreover, there can be no claim that the California program is simply intrastate regulation beyond the reach of the Sherman Act. See *Schwegmann Bros.* v. *Calvert Corp., supra; Burke* v. *Ford,* 389 U. S. 320 (1967) (*per curiam*).

Thus, we must consider whether the State's involvement in the price-setting program is sufficient to establish antitrust immunity under *Parker* v. *Brown,* 317 U. S. 341 (1943). That immunity for state regulatory programs is grounded in our federal structure. "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority,

---

whatever power the States hold under the Twenty-first Amendment to control liquor prices. S. Rep. No. 94-466, p. 2 (1975); H. R. Rep. No. 94-341, p. 3, n. 2 (1975). We consider the effect of the Twenty-first Amendment on this case in Part III, *infra.*

[7] In *Rice,* the California Supreme Court found direct evidence that resale price maintenance resulted in horizontal price fixing. See *supra,* at 101, and n. 3. Although the Court of Appeal made no such specific finding in this case, the court noted that the wine pricing system "cannot be upheld for the same reasons the retail price maintenance provisions were declared invalid in *Rice.*" *Midcal Aluminum, Inc.* v. *Rice,* 90 Cal. App. 3d 979, 983, 153 Cal. Rptr. 757, 760 (1979).

an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Id.,* at 351. In *Parker* v. *Brown,* this Court found in the Sherman Act no purpose to nullify state powers. Because the Act is directed against "individual and not state action," the Court concluded that state regulatory programs could not violate it. *Id.,* at 352.

Under the program challenged in *Parker,* the State Agricultural Prorate Advisory Commission authorized the organization of local cooperatives to develop marketing policies for the raisin crop. The Court emphasized that the Advisory Commission, which was appointed by the Governor, had to approve cooperative policies following public hearings: "It is the state which has created the machinery for establishing the prorate program. . . . [I]t is the state, acting through the Commission, which adopts the program and enforces it. . . ." *Ibid.* In view of this extensive official oversight, the Court wrote, the Sherman Act did not apply. Without such oversight, the result could have been different. The Court expressly noted that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful. . . ." *Id.,* at 351.

Several recent decisions have applied *Parker*'s analysis. In *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773 (1975), the Court concluded that fee schedules enforced by a state bar association were not mandated by ethical standards established by the State Supreme Court. The fee schedules therefore were not immune from antitrust attack. "It is not enough that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." *Id.,* at 791. Similarly, in *Cantor* v. *Detroit Edison Co.,* 428 U. S. 579 (1976), a majority of the Court found that no antitrust immunity was conferred when a state agency passively accepted a public utility's tariff. In contrast, Arizona rules against lawyer advertising were held immune from Sherman Act challenge be-

cause they "reflect[ed] a clear articulation of the State's policy with regard to professional behavior" and were "subject to pointed re-examination by the policymaker—the Arizona Supreme Court—in enforcement proceedings." *Bates v. State Bar of Arizona,* 433 U. S. 350, 362 (1977).

Only last Term, this Court found antitrust immunity for a California program requiring state approval of the location of new automobile dealerships. *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,* 439 U. S. 96 (1978). That program provided that the State would hold a hearing if an automobile franchisee protested the establishment or relocation of a competing dealership. *Id.,* at 103. In view of the State's active role, the Court held, the program was not subject to the Sherman Act. The "clearly articulated and affirmatively expressed" goal of the state policy was to "displace unfettered business freedom in the matter of the establishment and relocation of automobile dealerships." *Id.,* at 109.

These decisions establish two standards for antitrust immunity under *Parker* v. *Brown.* First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the State itself. *City of Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389, 410 (1978) (opinion of BRENNAN, J.).[8] The California system for wine pricing satisfies the first standard. The legislative policy is forthrightly stated and clear in its purpose to permit resale price maintenance. The program, however, does not meet the second requirement for *Parker* immunity. The State simply authorizes price setting and enforces the prices established by private parties. The State neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate

[8] See *Norman's On the Waterfront, Inc.* v. *Wheatley,* 444 F. 2d 1011, 1018 (CA3 1971); *Asheville Tobacco Bd.* v. *FTC,* 263 F. 2d 502, 509–510 (CA4 1959); Note, *Parker v. Brown* Revisited: The State Action Doctrine After *Goldfarb, Cantor,* and *Bates,* 77 Colum. L. Rev. 898, 916 (1977).

the terms of fair trade contracts. The State does not monitor market conditions or engage in any "pointed reexamination" of the program.[9] The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement. As *Parker* teaches, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful. . . ." 317 U. S., at 351.

## III

Petitioner contends that even if California's system of wine pricing is not protected state action, the Twenty-first Amendment bars application of the Sherman Act in this case. Section 1 of that Amendment repealed the Eighteenth Amendment's prohibition on the manufacture, sale, or transportation of liquor. The second section reserved to the States certain power to regulate traffic in liquor: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." The remaining question before us is whether §.2 permits California to countermand the congressional policy—adopted under the commerce power—in favor of competition.

## A

In determining state powers under the Twenty-first Amendment, the Court has focused primarily on the language of the

[9] The California program contrasts with the approach of those States that completely control the distribution of liquor within their boundaries. *E. g.,* Va. Code §§ 4–15, 4–28 (1979). Such comprehensive regulation would be immune from the Sherman Act under *Parker* v. *Brown,* since the State would "displace unfettered business freedom" with its own power. *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.,* 439 U. S. 96, 109 (1978); see *State Board* v. *Young's Market Co.,* 299 U. S. 59, 63 (1936).

provision rather than the history behind it. *State Board* v. *Young's Market Co.*, 299 U. S. 59, 63–64 (1936).[10]   In terms, the Amendment gives the States control over the "transportation or importation" of liquor into their territories.  Of course, such control logically entails considerable regulatory power not strictly limited to importing and transporting alcohol. *Ziffrin, Inc.* v. *Reeves,* 308 U. S. 132, 138 (1939).  We should not, however, lose sight of the explicit grant of authority.

This Court's early decisions on the Twenty-first Amendment recognized that each State holds great powers over the importation of liquor from other jurisdictions.  *Young's Market, supra,* concerned a license fee for interstate imports of alcohol; another case focused on a law restricting the types of liquor that could be imported from other States, *Mahoney* v. *Joseph Triner Corp.,* 304 U. S. 401 (1938); two others

---

[10] The approach is supported by sound canons of constitutional interpretation and demonstrates a wise reluctance to wade into the complex currents beneath the congressional proposal of the Amendment and its ratification in the state conventions.  The Senate sponsor of the Amendment resolution said the purpose of § 2 was "to restore to the States . . . absolute control in effect over interstate commerce affecting intoxicating liquors. . . ."  76 Cong. Rec. 4143 (1933) (remarks of Sen. Blaine).  Yet he also made statements supporting Midcal's claim that § 2 was designed only to ensure that "dry" States could not be forced by the Federal Government to permit the sale of liquor.  See 76 Cong. Rec., at 4140–4141.  The sketchy records of the state conventions reflect no consensus on the thrust of § 2, although delegates at several conventions expressed their hope that state regulation of liquor traffic would begin immediately.  E. Brown, Ratification of the Twenty-first Amendment to the Constitution 104 (1938) (Wilson, President of Idaho Convention); *id.,* at 191–192 (Darnall, President of Maryland Convention); *id.,* at 247 (Gaylord, Chairman of Missouri Convention); *id.,* at 469–473 (resolution adopted at Washington Convention calling for state action "to regulate the liquor traffic").  See generally Note, The Effect of the Twenty-first Amendment on State Authority to Control Intoxicating Liquors, 75 Colum. L. Rev. 1578, 1580 (1975); Note, Economic Localism in State Alcoholic Beverage Laws—Experience Under the Twenty-First Amendment, 72 Harv. L. Rev. 1145, 1147 (1959).

involved "retaliation" statutes barring imports from States that proscribed shipments of liquor from other States, *Joseph S. Finch & Co.* v. *McKittrick,* 305 U. S. 395 (1939); *Indianapolis Brewing Co.* v. *Liquor Control Comm'n,* 305 U. S. 391 (1939). The Court upheld the challenged state authority in each case, largely on the basis of the States' special power over the "importation and transportation" of intoxicating liquors. Yet even when the States had acted under the explicit terms of the Amendment, the Court resisted the contention that § 2 "freed the States from all restrictions upon the police power to be found in other provisions of the Constitution." *Young's Market, supra,* at 64.

Subsequent decisions have given "wide latitude" to state liquor regulation, *Joseph E. Seagram & Sons, Inc.* v. *Hostetter,* 384 U. S. 35, 42 (1966), but they also have stressed that important federal interests in liquor matters survived the ratification of the Twenty-first Amendment. The States cannot tax imported liquor in violation of the Export-Import Clause. *Department of Revenue* v. *James Beam Co.,* 377 U. S. 341 (1964). Nor can they insulate the liquor industry from the Fourteenth Amendment's requirements of equal protection, *Craig* v. *Boren,* 429 U. S. 190, 204–209 (1976), and due process, *Wisconsin* v. *Constantineau,* 400 U. S. 433, 436 (1971).

More difficult to define, however, is the extent to which Congress can regulate liquor under its interstate commerce power. Although that power is directly qualified by § 2, the Court has held that the Federal Government retains some Commerce Clause authority over liquor. In *William Jameson & Co.* v. *Morgenthau,* 307 U. S. 171 (1939) (*per curiam*), this Court found no violation of the Twenty-first Amendment in a whiskey-labeling requirement prescribed by the Federal Alcohol Administration Act, 49 Stat. 977. And in *Ziffrin, Inc.* v. *Reeves, supra,* the Court did not uphold Kentucky's system of licensing liquor haulers until it was satisfied that the state program was reasonable. 308 U. S., at 139.

The contours of Congress' commerce power over liquor were sharpened in *Hostetter* v. *Idlewild Liquor Corp.*, 377 U. S. 324, 331–332 (1964).

> "To draw a conclusion . . . that the Twenty-first Amendment has somehow operated to 'repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned would, however, be an absurd oversimplification. If the Commerce Clause had been *pro tanto* 'repealed,' then Congress would be left with no regulatory power over interstate or foreign commerce in intoxicating liquor. Such a conclusion would be patently bizarre and is demonstrably incorrect."

The Court added a significant, if elementary, observation: "Both the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case." *Id.*, at 332. See *Craig* v. *Boren, supra*, at 206.[11]

This pragmatic effort to harmonize state and federal powers has been evident in several decisions where the Court held liquor companies liable for anticompetitive conduct not mandated by a State. See *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211 (1951); *United States* v. *Frankfort Distilleries, Inc.*, 324 U. S. 293 (1945). In *Schwegmann Bros.* v. *Calvert Corp.*, 341 U. S. 384 (1951), for example, a liquor manufacturer attempted to force a distributor to comply with Louisiana's resale price maintenance program, a

---

[11] In *Nippert* v. *Richmond*, 327 U. S. 416 (1946), the Court commented in a footnote:

"[E]ven the commerce in intoxicating liquors, over which the Twenty-first Amendment gives the States the highest degree of control, is not altogether beyond the reach of the federal commerce power, at any rate when the State's regulation squarely conflicts with regulation imposed by Congress. . . ." *Id.*, at 425, n. 15.

program similar in many respects to the California system at issue here. The Court held that because the Louisiana statute violated the Sherman Act, it could not be enforced against the distributor. Fifteen years later, the Court rejected a Sherman Act challenge to a New York law requiring liquor dealers to attest that their prices were "no higher than the lowest price" charged anywhere in the United States. *Joseph E. Seagram & Sons, Inc.* v. *Hostetter, supra.* The Court concluded that the statute exerted "no irresistible economic pressure on the [dealers] to violate the Sherman Act in order to comply," but it also cautioned that "[n]othing in the Twenty-first Amendment, of course, would prevent enforcement of the Sherman Act" against an interstate conspiracy to fix liquor prices. *Id.,* at 45–46. See *Burke* v. *Ford,* 389 U. S. 320 (1967) (*per curiam*).

These decisions demonstrate that there is no bright line between federal and state powers over liquor. The Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system. Although States retain substantial discretion to establish other liquor regulations, those controls may be subject to the federal commerce power in appropriate situations. The competing state and federal interests can be reconciled only after careful scrutiny of those concerns in a "concrete case." *Hostetter* v. *Idlewild Liquor Corp., supra,* at 332.

### B

The federal interest in enforcing the national policy in favor of competition is both familiar and substantial.

> "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms."

*United States* v. *Topco Associates, Inc.*, 405 U. S. 596, 610 (1972).

See *Northern Pacific R. Co.* v. *United States*, 356 U. S. 1, 4 (1958). Although this federal interest is expressed through a statute rather than a constitutional provision, Congress "exercis[ed] all the power it possessed" under the Commerce Clause when it approved the Sherman Act. *Atlantic Cleaners & Dyers* v. *United States*, 286 U. S. 427, 435 (1932); see *City of Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S., at 398. We must acknowledge the importance of the Act's procompetition policy.

The state interests protected by California's resale price maintenance system were identified by the state courts in this case, 90 Cal. App. 3d, at 983, 153 Cal. Rptr., at 760, and in *Rice* v. *Alcoholic Beverage Control Appeals Bd.*, 21 Cal. 3d, at 451, 579 P. 2d, at 490.[12] Of course, the findings and conclusions of those courts are not binding on this Court to the extent that they undercut state rights guaranteed by the Twenty-first Amendment. See *Hooven & Allison Co.* v. *Evatt*, 324 U. S. 652, 659 (1945); *Creswill* v. *Knights of Pythias*, 225 U. S. 246, 261 (1912). Nevertheless, this Court accords "respectful consideration and great weight to the views of the state's highest court" on matters of state law, *Indiana ex rel. Anderson* v. *Brand*, 303 U. S. 95, 100 (1938), and we customarily accept the factual findings of state courts in the

---

[12] As the unusual posture of this case reflects, the State of California has shown less than an enthusiastic interest in its wine pricing system. As we noted, the state agency responsible for administering the program did not appeal the decision of the California Court of Appeal. See *supra*, at 101–102; Tr. of Oral Arg. 20. Instead, this action has been maintained by the California Retail Liquor Dealers Association, a private intervenor. But neither the intervenor nor the State Attorney General, who filed a brief *amicus curiae* in support of the legislative scheme, has specified any state interests protected by the resale price maintenance system other than those noted in the state-court opinions cited in text.

absence of "exceptional circumstances." *Lloyd A. Fry Roofing Co.* v. *Wood,* 344 U. S. 157, 160 (1952).

The California Court of Appeal stated that its review of the State's system of wine pricing was "controlled by the reasoning of the [California] Supreme Court in *Rice [supra].*" 90 Cal. App. 3d, at 983, 153 Cal. Rptr., at 760. Therefore, we turn to that opinion's treatment of the state interests in resale price maintenance for distilled liquors.

In *Rice,* the State Supreme Court found two purposes behind liquor resale price maintenance: "to promote temperance and orderly market conditions." 21 Cal. 3d, at 451, 579 P. 2d, at 490.[13] The court found little correlation between resale price maintenance and temperance. It cited a state study showing a 42% increase in per capita liquor consumption in California from 1950 to 1972, while resale price maintenance was in effect. *Id.,* at 457–458, 579 P. 2d, at 494, citing California Dept. of Finance, Alcohol and the State: A Reappraisal of California's Alcohol Control Policies, xi, 15 (1974). Such studies, the court wrote, "at the very least raise a doubt regarding the justification for such laws on the ground that they promote temperance." 21 Cal. 3d, at 457–458, 579 P. 2d, at 494.[14]

The *Rice* opinion identified the primary state interest in orderly market conditions as "protect[ing] small licensees from predatory pricing policies of large retailers." *Id.,* at 456, 579 P. 2d, at 493.[15] In gauging this interest, the court

---

[13] The California Court of Appeal found no additional state interests in the instant case. 90 Cal. App. 3d, at 984, 153 Cal. Rptr., at 760–761. That court rejected the suggestion that the wine price program was designed to protect the State's wine industry, pointing out that the statutes "do not distinguish between California wines and imported wines." *Ibid.*

[14] See *Joseph E. Seagram & Sons, Inc.* v. *Hostetter,* 384 U. S. 35, 39 (1966) (citing study concluding that resale price maintenance in New York State had "no significant effect upon the consumption of alcoholic beverages").

[15] The California Supreme Court also stated that orderly market conditions might "reduce excessive consumption, thereby encouraging temper-

adopted the views of the Appeals Board of the Alcoholic Beverages Control Department, which first ruled on the claim in *Rice.* The state agency "rejected the argument that fair trade laws were necessary to the economic survival of small retailers. . . ." *Ibid.* The agency relied on a congressional study of the impact on small retailers of fair trade laws enacted under the Miller-Tydings Act. The study revealed that "states with fair trade laws had a 55 percent higher rate of firm failures than free trade states, and the rate of growth of small retail stores in free trade states between 1956 and 1972 was 32 per cent higher than in states with fair trade laws." *Ibid.,* citing S. Rep. No. 94–466, p. 3 (1975). Pointing to the congressional abandonment of fair trade in the 1975 Consumer Goods Pricing Act, see *supra,* at 102, the State Supreme Court found no persuasive justification to continue "fair trade laws which eliminate price competition among retailers." 21 Cal. 3d, at 457, 579 P. 2d, at 494. The Court of Appeal came to the same conclusion with respect to the wholesale wine trade. 90 Cal. App. 3d, at 983, 153 Cal. Rptr., at 760.

We have no basis for disagreeing with the view of the California courts that the asserted state interests are less substantial than the national policy in favor of competition. That evaluation of the resale price maintenance system for wine is reasonable, and is supported by the evidence cited by the State Supreme Court in *Rice.* Nothing in the record in this case suggests that the wine pricing system helps sustain small retail establishments. Neither the petitioner nor the State Attorney General in his *amicus* brief has demonstrated that the program inhibits the consumption of alcohol by Californians. We need not consider whether the legitimate state interests in temperance and the protection of small retailers

ance." 21 Cal. 3d, at 456, 579 P. 2d, at 493. The concern for temperance, however, was considered by the court as an independent state interest in resale price maintenance for liquor.

ever could prevail against the undoubted federal interest in a competitive economy. The unsubstantiated state concerns put forward in this case simply are not of the same stature as the goals of the Sherman Act.

We conclude that the California Court of Appeal correctly decided that the Twenty-first Amendment provides no shelter for the violation of the Sherman Act caused by the State's wine pricing program.[16] The judgment of the California Court of Appeal, Third Appellate District, is

*Affirmed.*

MR. JUSTICE BRENNAN did not take part in the consideration or decision of this case.

---

[16] Since Midcal requested only injunctive relief from the state court, there is no question before us involving liability for damages under 15 U. S. C. § 15.