The ALCOHOLIC BEVERAGE CONTROL
BOARD OF the COMMONWEALTH OF
KENTUCKY, etc., et al., Appellants,

v.

TAYLOR DRUG STORES, INC.,
Appellee.

KENTUCKY RETAIL LIQUOR ASSOCI-
ATION, et al., Appellants,

v.

TAYLOR DRUG STORES, INC.,
Appellee.

KENTUCKY WHOLESALE LIQUOR
DEALERS ASSOCIATION, INC., et
al., Appellants,

v.

TAYLOR DRUG STORES, INC.,
Appellee.

KENTUCKY WHOLESALE LIQUOR
DEALERS ASSOCIATION, INC., et
al., Appellants,

v.

STATE LIQUORS, INC., Appellee.

Richard H. LEWIS, et al., Appellants,

v.

STATE LIQUORS, INC., Appellee.

Supreme Court of Kentucky.

July 6, 1982.

Catherine C. Staib, Frankfort, for Alcoholic Beverage Control Bd.

Irwin Waterman and Alan Linker, Morris, Garlove, Waterman & Johnson, Louisville, for Kentucky Wholesale Liquor Dealers Ass'n, Inc., and its members.

Frank E. Haddad, Jr., and Leon J. Shaikun, Louisville, for Ky. Retail Liquor, Roland & McFarland Liquors and Cheers, Inc.

Bruce F. Clark, Stites, McElwain & Fowler, Frankfort, for Distilled Spirits Counsel of U. S.

Albert F. Reutlinger, Louisville, for Taylor Drug Stores, Inc.

William A. Young, Frankfort, for State Liquors, Inc.

PALMORE, Chief Justice.

In two separate proceedings originating before the Kentucky Alcoholic Beverage Control Board (hereinafter ABC Board) the Franklin Circuit Court adjudged certain vital provisions[1] of the Distilled Spirits and Wine Fair Trade Act, KRS 244.380 et seq., to be in violation of the Commerce Clause[2] of the United States Constitution, the Sherman Antitrust Act,[3] and Secs. 1 and 2 of the Kentucky Constitution. Appeals in both cases were transferred to this court and consolidated for purposes of argument and disposition.

With exceptions not here pertinent, KRS 244.380 prohibits the sale of wine or liquor that bears the name, brand or trademark of the distiller, rectifier, blender, vintner or owner, and is in fair and open competition with commodities of the same class produced by others, except pursuant to a "fair trade" contract providing that the purchaser will not resell the product "except at the price stipulated by the vendor" and, upon resale, will exact a similar requirement of the buyer. Horizontal transactions, as between producer and producer, wholesaler and wholesaler, or retailer and retailer, are specifically excluded.

KRS 244.390 directs that the fair trade contract provide for minimum resale prices reflecting the following markups: (a) for the wholesaler, not less than 15% on liquor and 20% on wine; and (b) for the retailer, not less than 33⅓% in less than case lots or 10% in case lots. KRS 244.390(3) provides in substance that these markups must be calculated on the basis of actual prices plus certain other charges.

KRS 244.390 further provides that the entire state shall constitute a single trade area, in which no licensee may differentiate in its prices, that the Department of Alcoholic Beverage Control shall at all times investigate "and regulate" "any unusual differences between market prices and minimum resale prices contained in the pertinent contracts on file, etc.

KRS 244.400 requires all producers to file with the Department of Alcoholic Beverage Control copies of the fair trade contracts under which they sell or propose to sell wine or liquor to wholesalers, and KRS 244.410 exacts the same requirement of wholesalers selling to retailers. Each contract must show, among other things, the stipulated minimum resale price, "arrived at in the amount prescribed by ... KRS 244.390, and in the manner provided by subsection (3) of KRS 244.390," etc.

KRS 244.470 declares that any licensee who sells or offers wine or liquor for less than the price stipulated in a fair trade contract entered into under these statutes, whether or not he is a party to the contract, shall be guilty of unfair competition, which is a ground for license-revocation under KRS 243.490(2).

---

1. Specifically, KRS 244.380, 244.390 and 244.470. The statute originated as Ch. 13, Acts of 1940.

2. Art. 1, Sec. 8, U. S. Constitution.

3. 15 U.S.C. Secs. 1 et seq.

The effect of these statutes is to confine price competition in the liquor and wine industry to the manufacturer or producer level of the economic ladder. Only the producer is free to set his own prices purely in accordance with the dictates of competition. At the time these lawsuits originated, however, Kentucky had what is known as an "affirmation" statute, KRS 244.245 (enacted in 1978), which required every producer to certify that it would not sell or offer its products for sale in any other state or in the District of Columbia at lower prices than those charged to licensed Kentucky wholesalers. This statute was repealed by the 1982 General Assembly, and in the course of oral arguments before this court the parties agreed that the cases be decided on the basis of the law as it now is, without consideration of KRS 244.245.

During all times pertinent to this litigation the ABC Board, pursuant to its regulatory powers under KRS 13.082 and 241.060, has had in effect certain administrative regulations designed to implement the aforementioned statutes. One of these, 804 KAR 3:010, directs the Board "from time to time by order after notice and hearing . . . [to] adopt minimum case values [of distilled spirits] upon the basis of which the minimum markup of the wholesaler must be taken. The minimum case values shall reflect actual cost of the delivered case of distilled spirits (determined in accordance with generally accepted accounting principles), including a reasonable producers' markup, and in the determination thereof, the board shall take into consideration the total costs of production, handling and storage, and marketing . . ."

Similarly, 804 KAR 3:030 establishes a method for determining the cost of wine, based mainly on current prices for California wines in bulk, and provides that the statutory markups be added to this "minimum base cost" in order to establish a minimum wholesale price.

In its findings of fact the ABC Board cited these various statutes and regulations in support of its factual conclusion that the fair trade law "is actively supervised by the Commonwealth at all levels of distribution." It does not follow, however, that because a law is on the books it is carried out in practice. The actual fact appears to be, as indicated in the brief submitted by the wholesale dealers, that until the repeal of KRS 244.245 (the affirmation statute) by the 1982 General Assembly the minimum markup from producer to wholesaler was applied to whatever price was set by the producer and certified by it as the lowest price at which it sold the product in any of the states. "The repeal of affirmation," it is argued, "will now *presumably* reinstate the formula determination." (Emphasis added.) In any event, it is not possible for the administrative regulations to rise above the statutes. Even if the ABC Board undertakes the elaborate task of determining minimum case values of distilled spirits in the manner specified by 804 KAR 3:010, and the minimum wholesale price of wine pursuant to 804 KAR 3:030, such determinations are not binding on the producer, and if his selling price to the wholesaler happens to be different, the plain language of KRS 244.390(3) requires the markup to be calculated "on the *actual price* . . . paid for the distilled spirits or wine sold . . ." (Emphasis added.) By no amount of calculating and regulating can the ABC Board make the statutory markups applicable to a figure different from the actual price charged and paid.

The closest the statutes come to conferring some degree of administrative control over prices is that KRS 244.390(6) directs the Department of Alcoholic Beverage Control "at all times [to] investigate and regulate any unusual differences between market prices and minimum resale prices provided for in fair trade contracts on file. If upon investigation it appears that the orderliness of the market has been disrupted by fluctuations in market prices, licensees responsible for such practices shall be deemed guilty of unfair competition . . ." Quite aside from the distinct possibility that this particular subsection is too vague for practical application and enforcement, certainly it does not authorize the Department to effect any remedy in the form of directing price revisions.

■ The point of this particular analysis is that the state has nothing to do with prices and pricing of wines and liquors except for establishing and enforcing minimum markups from producer to wholesaler and from wholesaler to retailer. These minimum markups are entirely statutory, have remained unchanged since the law was first enacted in 1940,[4] and are not subject to repeal or modification through any process of monitoring, supervision or "pointed reexamination"[5] except as the General Assembly itself may choose to accomplish by direct legislation. The provisions of 804 KAR 3:010 and 3:030 to the effect that they shall be applied to calculated cost figures rather than actual prices simply appear to be in conflict with the statute, hence unauthorized and void. This case, therefore, must be decided on the basis of the statutes alone.

■ It is our opinion that the trial court was correct in determining that these statutes provide for a system of resale pricing that conflicts with the Sherman Act as that Act has come to be construed by the U. S. Supreme Court. We cannot agree, however, that they violate Secs. 1 or 2 of the Kentucky Constitution.[6] While it is true that in *General Electric Company v. American Buyers Cooperative*, Ky., 316 S.W.2d 354 (1958), this court held Kentucky's Fair Trade Act (KRS 365.080 and 365.090) void on that ground, in the same breath it distinguished the statutes involved in this case as follows:

"And although comparable, the statute relating to minimum markup resale prices of alcoholic beverages, KRS 244.380 et seq., is distinguishable, for its constitutional validity rests on the broad legislative power to regulate and control intoxicating liquor. See *Reeves v. Simon*, 289 Ky. 793, 160 S.W.2d 149."

About the weakest argument that can be made against a clear enunciation of what a court thinks in a formal opinion is that the statement is "dictum," or was not necessary to a decision of the case. True, the court did not in that case pass on the validity of KRS 244.080 et seq., but surely it was incumbent upon it to explain why it was reaching a conclusion that was in apparent conflict with what it had held in *Reeves v. Simon*. By distinguishing *Reeves v. Simon* the court made a conscious choice not to override it, and we do not see any sound reason for not according to this particular bit of "dictum" a reasonable degree of precedential weight.

But in *Reeves v. Simon*, it is contended, the thrust of the argument was along the lines of constitutional provisions other than Secs. 1 and 2. That may be so, but what the court did hold in that case leaves very little doubt that an argument centered on Secs. 1 and 2 would have met the same fate:

"[We] cannot say that the instant law calling for strict price control and the elimination of ruinous competition has no relation to the subject or that it is arbitrary and discriminatory and not based upon substantial grounds." *Reeves v. Simon*, 160 S.W.2d at p. 152.

In considering whether *Reeves v. Simon* should now be overruled after the passage of 40 years we find ourselves facing the same bedrock principle of constitutional jurisprudence that the court faced then—that is, if there is any reasonable basis for legislation that treats one class of people or their business or occupation differently from another, the courts should uphold the legislative choice. It is well known and long recognized that the liquor business warrants closer supervision and control by the state than most other commercial pursuits. Whether the pricing of commodities

---

4. See Ch. 13, Sec. 2, Acts of 1940.

5. Cf. *Bates v. State Bar of Arizona*, 433 U.S. 350, 362, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977); *California Liquor Dealers v. Midcal Aluminum*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980).

6. Const. Sec. 1 guarantees, among other things, "the right of acquiring and protecting property." Sec. 2 negates the existence of arbitrary power over the "lives, liberty and property of freemen," etc.

in that business ought to be separated out from the other areas of state control may be a fair question, but at least it is arguable, and we think it is an argument that falls within the prerogative of the General Assembly to decide. Our conclusion is that the spirit of *Reeves v. Simon* reaches beyond those constitutional provisions specifically mentioned in the opinion and calls for the same answer with respect to Secs. 1 and 2 of the Kentucky Constitution. And we decline to overrule it.

We come now to the Sherman Act question.

"Although this federal interest is expressed through a statute rather than a constitutional provision, Congress 'exercis[ed] all the power it possessed' under the Commerce Clause when it approved the Sherman Act. We must acknowledge the importance of the Act's procompetition policy." *California Liquor Dealers v. Midcal Aluminum*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) [hereinafter called *Midcal*].

"This Court has ruled consistently that resale price maintenance illegally restrains trade ... For many years, however, the Miller-Tydings Act of 1937 permitted the States to authorize resale price maintenance. 50 Stat. 693. The goal of that statute was to allow the States to protect small retail establishments that Congress thought might otherwise be driven from the market by large-volume discounters. But in 1975 that congressional permission was rescinded. The Consumer Goods Pricing Act of 1975, 89 Stat. 801, repealed the Miller-Tydings Act and related legislation. Consequently, the Sherman Act's ban on resale price maintenance now applies to fair trade contracts unless an industry or program enjoys a special anti-trust immunity." *Id.*, at p. 97, 100 S.Ct. 937, 63 L.Ed.2d 233.

As in *Midcal*, we begin with the premise that the resale price maintenance system existing under the statutes here in question violates the Sherman Act if it is applicable. In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court held that the Sherman Act does not apply to state vis-a-vis individual action, and that state regulatory programs could not violate it. *Midcal*, 445 U.S. at p. 104, 100 S.Ct. at p. 942. The real problem in this as in other similar cases is to determine whether the anticompetitive conduct is primarily state action or the action of private individuals under a cloak of state authority.

As of this writing, *Midcal* is the latest word on the subject by the U. S. Supreme Court, holding invalid the California statutes relating to the pricing of wine. Parallel statutes covering the pricing of liquor had been held invalid on the same ground by the California Supreme Court in *Rice v. Alcoholic Bev. Control Appeals Bd.*, 21 Cal.3d 431, 146 Cal.Rptr. 585, 579 P.2d 476 (1978). In *Midcal*, the statutes bound all wholesalers to a resale price set in one of two ways—either the producer and a wholesaler entered into a fair trade contract setting the price, or the wholesaler posted a resale price schedule for that producer's brands. Once the wholesale price was fixed in this manner, all other wholesalers and licensed merchants in the trade area (as defined by statute) were prohibited from selling, and retailers were prohibited from buying,[7] at a lower price. "The wine producer holds the power to prevent price competition by dictating the prices charged by wholesalers." *Midcal*, 445 U.S. at p. 103, 100 S.Ct. at p. 942.

In striking down the California statutes the Supreme Court said:

"The program ... does not meet the second requirement for *Parker* immunity. The State simply authorizes price-setting and enforces prices established by private parties. The State neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts. The State does not monitor market conditions or engage in any 'pointed re-examination' of the program. The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement

7. Cal.Bus. & Prof.Code Anno., Sec. 24862 (West 1964).

over what is essentially a private price-fixing arrangement. As *Parker* teaches, 'a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful.' "[8] *Midcal,* 445 U.S. at p. 106, 100 S.Ct. at p. 942.

It seems to us that the critical test of "state action" must be whether the state exercises some reasonable degree of control over the prices. Somewhere along the line an agency of the state must possess and must exercise the right to pass judgment, either by itself establishing the price, or by reviewing and accepting, rejecting or modifying a price set by someone else. Without this ultimate power no amount of monitoring, supervision, re-examination, or prescribing of contract terms can have any meaningful effect. In the California wine case the state did nothing but enforce prices fixed by private individuals. In the instance of Kentucky the state participates in fixing prices only to the extent that it adds statutory minimum markups to prices fixed by private individuals. From the standpoint of "state action" this difference is merely superficial, because it does not permit any judgmental choice by the state with respect to the resulting price. It is only a mechanical progression from the initial price set by the producer. We realize, of course, that in fixing this initial price the producer operates in a free market and reacts to the competitive pressure of other brands, but that was so in California as well. Thus we are forced to the same conclusion reached by the trial court, which is that there is no fundamental basis upon which we can distinguish this case from *Midcal.*

As in *Midcal,* the appealing parties argue that these statutes fall within the protection of the 21st Amendment. We find in that theory even less substance than did the U. S. Supreme Court in *Midcal.*

The judgments of the trial court should be modified to eliminate their conclusions

with respect to Secs. 1 and 2 of the Kentucky Constitution. As so modified they are affirmed.

AKER, O'HARA and STEPHENS, JJ., concur in the result only.

AKER, J., would invalidate the statutes on both Sherman Antitrust and state constitutional grounds.

O'HARA and STEPHENS, JJ., would invalidate the statutes solely under Section 2 of the Kentucky Constitution.

CLAYTON, J., dissents by separate opinion.

CLAYTON, Justice, dissenting.

I am of the opinion that our legislative branch of government had the legal authority to do what it has done in this case.

---

8. The parties concede that the Kentucky statutes satisfy the first *Parker* test in that they

clearly articulate a state policy.