United States Court of Appeals,

Fifth Circuit.

No. 91-1364.

DFW METRO LINE SERVICES, A Texas Partnership, now known as U.S. Metro Line Services, Inc., Plaintiff-Appellant,

v.

SOUTHWESTERN BELL TELEPHONE, CORPORATION, A Missouri Corporation, Defendant-Appellee.

April 19, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before REAVELY, KING, and WIENER, Circuit Judges.

WIENER, Circuit Judge.

In this anti-trust case, Plaintiff-Appellant DFW Metro Line Services, now known as U.S. Metro Line Services, Inc. (Metro), appeals the dismissal of its suit against Defendant-Appellee Southwestern Bell Telephone Corporation (Bell), claiming that the district court erred in its determination that Bell was protected from anti-trust liability under the state action doctrine. Our plenary review of the record convinces us to agree with the district court's conclusion that the nature of the Texas regulatory scheme is such that Bell is immunized from suit under the state action doctrine. We therefore affirm that court's dismissal of Metro's complaint.

I

FACTS

Metro offers a flat rate telephone service between Dallas and Fort Worth called metro service or EMS. To provide this service, Metro must use Bell's telephone lines. At the time the dispute originated in 1982, Bell was leasing the lines to Metro, a licensed radio common carrier, at Radio Common Carrier-Direct Inward Dialing (RCC-DID) rates for the express purpose of providing one-way paging services. Without advising Bell, Metro later expanded its use of Bell's phone lines by instituting EMS service, thereby competing directly with Bell. When Bell discovered that Metro had expanded its services but was still paying the lower RCC-DID rates, Bell informed Metro that

it would have to pay the substantially higher, appropriate rate or the lease would be terminated. According to Bell, the higher rates were required by the Public Utility Commission (PUC)—which determines the rates to be charged based in part on the use to be made of the phone lines—under authority of the Public Utility Regulatory Act (PURA).[1]

## II

## PROCEEDINGS

Metro originally brought suit seeking a temporary restraining order (TRO) and preliminary and permanent injunctions preventing Bell from terminating telephone service to Metro, and asserting an anti-trust claim. The district court granted the TRO, and the parties submitted briefs on the issues. Based on these briefs, the district court lifted the TRO and denied Metro's application for preliminary injunction. In its decision, the district court concluded that Metro had little likelihood of success on the merits because Bell had demonstrated that it was entitled to immunity from anti-trust liability by meeting the requirements of the two-prong test set forth in *California Retail Liquor Dealers Association v. Midcal Aluminum Inc.*[2] (the *Midcal* test). The district court concluded that the active supervision requirement of the *Midcal* test was satisfied by PURA, which vested the PUC with power to ensure compliance with PURA, fixing and regulating rates, determining the classifications of customers and services, and determining the applicability of rates.

We affirmed the district court in *DFW Metro Line Services v. Southwestern Bell Tel. Co.* (*Metro I* ).[3] In addition to affirming the denial of a permanent injunction, the panel opinion in *Metro I* stated:

> As an additional basis for our holding, we find that Southwestern Bell is immune from the antitrust liability alleged in [Metro's] complaint under the "state action" doctrine enunciated in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), as applied to private

---

[1]TEX.REV.CIV.STAT.ANN. ART. 1446c (Vernon Supp.1989).

[2]445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). As is discussed in more detail below, private conduct is immunized from anti-trust liability if the action meets the two-prong *Midcal* test, which requires the party seeking immunity to show that (1) the conduct is regulated by the state; and (2) the state actively supervises the regulated activity.

[3]901 F.2d 1267 (5th Cir.), *reh'g denied,* 908 F.2d 971, *cert. denied,* 498 U.S. 985, 111 S.Ct. 519, 112 L.Ed.2d 530 (1990).

state-regulated ratemaking in *Southern Motor Carriers Rate Conference v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). Southwestern Bell clearly meets the two-prong test set out in *California Retail [Liquor] Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). There is no, therefore, likelihood of success on the merits in the instant case.[4]

Metro's petition for certiorari proved unsuccessful and the case was returned to the district court.

At that point in the proceedings, the district court addressed the merits of the case, and dismissed Metro's anti-trust action under Rule 12(b)(6). Metro appealed, and we affirmed the dismissal based on *Metro I* and the law of the case doctrine.[5] On writ of certiorari, the Supreme Court --- U.S. ----, 112 S.Ct. 2987, 120 L.Ed.2d 2987 (1992), vacated and remanded *Metro II* for further consideration in light of *Federal Trade Commission v. Ticor Title Insurance Co.*[6] It is that case which we consider on the Court's remand today.

III

ANALYSIS

A. *Standard of Review*

Although the district court dismissed Metro's claim for failure to state a cause of action under Rule 12(b)(6), it comes to us on appeal with an extensive record, developed in detail during the proceedings for injunctive relief. Given the status of the record and the extensive procedural history of this case, both parties stipulated at oral argument to this court that, in effect, we review the case as though it were before us on appeal from the grant or denial of a summary judgment motion.

Accordingly, we review the record "under the same standards which guided the district court."[7] These standards, set forth in the Supreme Court trilogy of *Anderson v. Liberty Lobby Inc.,*[8]

---

[4]*Id.* at 1269 n. 6.

[5]*DFW Metro Line Services v. Southwestern Bell Tel. Co.,* 947 F.2d 1486 (5th Cir.1991) (unpublished per curiam opinion) (*Metro II* ).

[6]504 U.S. ----, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992).

[7]*Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358 (5th Cir.1988).

[8]477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Celotex Corp. v. Catrett,*[9] and *Matsushita Electrical Industrial Co. v. Zenith,*[10] provide that summary judgment is appropriate when no issue of material fact exists and the movant is entitled to judgment as a matter of law.[11] In determining whether summary judgment was proper, all fact questions are viewed in the light most favorable to the nonmovant. Questions of law, however, are reviewed de novo.[12] A movant such as Bell is entitled to judgment as a matter of law if it demonstrates that it is entitled to claim immunization from liability on the grounds alleged.

Given the procedural history of this case, our de novo review is limited somewhat by the law of the case doctrine, which provides:

> The decision of a legal issue by an appellate court establishes the "law of the case" and must be followed in all subsequent proceedings in the same case at both the trial and appellate levels unless the evidence at a subsequent trial was substantially different, the controlling authority has since made a contrary decision of law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.[13]

As the Supreme Court's order of remand directed us to consider this case in light of *Ticor,* and a fair reading of that case discloses that the Court considered only the second prong of the *Midcal* test, it follows that the prior decision of this court regarding the first prong remains undisturbed. As such, the law of the case doctrine requires that we follow the prior panel's determination that Bell has met the first prong of the *Midcal* test, i.e., that Texas has expressly authorized the regulation. That leaves as the only issue for our review today whether Bell has satisfied the second prong of the *Midcal* test, as clarified in *Ticor,* which requires that the state actively supervise the regulated activity.

B. *Anti-Trust Law*

The Sherman Anti-Trust Act (the Act)[14] makes unlawful "[e]very contract, combination ...

---

[9]477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

[10]475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[11]*Celotex,* 477 U.S. at 323-25, 106 S.Ct. at 2552-54.

[12]*Walker,* 853 F.2d at 358.

[13]*Reid v. Rolling Fork Pub. Util. Dist.,* 979 F.2d 1084, 1086 (5th Cir.1992) (quoting *Schexnider v. McDermott Int'l Inc.,* 868 F.2d 717, 718-19 (5th Cir.1989)).

[14]15 U.S.C. §§ 1-7.

or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations...."[15] The act also makes it unlawful to "monopolize, or attempt to monopolize, or combine to conspire with any other person or persons to monopolize any part of the trade or commerce among the several States or with foreign nations...."[16] In the seminal case of *Parker v. Brown,*[17] the Supreme Court, addressing whether a state marketing program violated the Act, held that "in a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." Therefore, "in view of the [Act's] words and history, it must be taken to be a prohibition of individual and not state action."[18]

Thus, from *Parker* originated the "state action doctrine," which confers anti-trust immunity for state regulatory programs. The Court subsequently made clear in *Midcal*[19] that private party conduct pursuant to a regulatory program shares this immunity only if the conduct meets both prongs of a two-prong test, thenceforth called the "*Midcal* test." This test requires that: (1) the challenged restraint be clearly articulated and affirmatively expressed as state policy; and (2) the state actively supervise any anticompetitive conduct.[20]

*1. Clearly Articulated State Policy*

The district court held, and Bell agrees, that this prong is satisfied by PURA, which provides:

> This Act is enacted to protect the public interest inherent in the rates and services of public utilities. The legislature finds that public utilities are by definition monopolies in the areas they serve; that therefore the normal forces of competition which operate to regulate prices in the free enterprise society do not operate; and that therefore utility rates, operations and services are regulated by public agencies with the objective that such regulation shall operate as a substitute for such competition. The purpose of this Act is to establish a comprehensive regulatory system which is adequate to the task of regulating public utilities

---

[15]*Id.* § 1.

[16]*Id.* § 2.

[17]317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

[18]*Id.* at 352, 63 S.Ct. at 314.

[19]445 U.S. at 97, 100 S.Ct. at 937.

[20]*Id.* at 105, 100 S.Ct. at 943.

as defined by this Act, to assure rates, operations, and services which are just and reasonable to the consumers and to the utilities.[21]

Again, we have previously held in *Metro I*[22] that Bell meets the first prong of the *Midcal* Test. As neither *Ticor* nor any other Supreme Court decision or subsequent legislation has changed the legal foundation of that holding, we are bound by the law of the case doctrine to follow our finding in *Metro I* that the Texas system satisfies the first *Midcal* prong.

*2. State Supervision*

The real issue in this appeal, then, is the second prong of the *Midcal* Test—whether the state of Texas *actively supervises* the regulatory conduct in question within the contemplation of *Ticor*. The challenged conduct in *Ticor* was a horizontal price-fixing scheme within the title insurance industry. In the instant case, the identity of the challenged conduct is the focus of dispute between the parties. On one hand, Metro insists that the challenged conduct is Bell's threat to cut-off Metro's access to Bell's phone lines, thereby forcing Metro out of business. On the other hand, Bell contends that the challenged conduct is the application of the appropriate rate. According to Bell, the rate is set by the PUC and Bell has no discretion in its application. Bell also explains that the "threat" to cut-off Metro's line access was merely the explained consequences that would follow if—but only if—Metro refused to pay the appropriate line charges.

Despite Metro's protestations, the conduct which it challenges is the application of the established rates. Metro's attempt to finesse the language of PURA and to manipulate the facts is mere obfuscation. Although the ultimate *effect* of Bell's application of the higher rates may well be the death knell of Metro's business, that does not alter the character of Bell's initial conduct. In other words, the possible *future consequences* of the action are irrelevant to our inquiry. Neither is it of consequence that Bell may have harbored some secret desire to rid itself of a competitor. The state action doctrine " "does not depend on the subjective motivation of the individual actors, but rather on the satisfaction of the objective standards set forth in *Parker* ... and authorities which interpret it.'

---

[21]PURA § 2.

[22]*Metro I,* 901 F.2d at 1267.

"[23] The only question for our review is whether the state sufficiently supervises the challenged conduct—here, the ratemaking and rate application process.

Having identified the challenged conduct, we now examine the requirements of *Midcal's* active supervision prong, as newly restated in *Ticor.* In that case, the Supreme Court held that " "the mere presence of some state involvement or monitoring does not suffice.' "[24] Rather, the state supervision must be active; state officials must be vested with the power to review particular anti-competitive acts and to disapprove those actions that do not comply with state policy.[25] "[T]he purpose of the active supervision inquiry is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices. Its purpose is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties."[26]

The Texas regulatory structure under PURA provides for an active role for the PUC. The PUC is authorized to establish rates, which are defined as "every compensation ... and any rules, regulations, practices or contracts affecting any such compensation, tariff ... or classification."[27] The PUC's authority, therefore, is not limited to reviewing the fee charged for a particular service, but in fact extends to reviewing rules, regulations, and practices of a utility. In addition, PURA provides a forum for complaints from any affected person or from the PUC "whenever the regulatory authority ... finds that the existing rates of any public utility for any service are unreasonable or in any way in violation of any provision of the law."[28]

---

[23]*Nugget Hydroelectric, L.P. v. Pacific Gas & Elec. Co.,* 981 F.2d 429, 434 (9th Cir.1992) (quoting *Llewellyn v. Crothers,* 765 F.2d 769, 774 (9th Cir.1985)).

[24]*Ticor,* 504 U.S. at ----, 112 S.Ct. at 2177, 119 L.Ed.2d at 422 (quoting *Patrick v. Burget,* 486 U.S. 94, 100-101, 108 S.Ct. 1658, 1662-63, 100 L.Ed.2d 83 (1988)).

[25]*Id.* 504 U.S. at ---- - ----, 112 S.Ct. at 2177, 119 L.Ed.2d at 422-23.

[26]*Id.*

[27]PURA § 3(d).

[28]PURA § 42.

Alone, however, this potential for supervision does not satisfy the second prong of the *Midcal* test. The PUC must actually fulfill the active role granted to it under the statute.

A review of the record demonstrates to our comfortable satisfaction that the PUC does in fact actively supervise ratemaking and enforcement as defined by PURA to include the rules, regulations, and practices of utilities. The record reflects numerous references to the PUC's inquiry into the reasonableness of Bell's rates, in Docket 8585 filed January 4, 1989.[29] In addition to this specific inquiry into Bell's rates, published decisions reflect that the PUC has conducted other broad-based ratemaking proceedings.[30] In like manner, the record and published opinions together demonstrate that PURA provides a forum for complaints regarding the application of tariffs.[31]

Most importantly, Metro and Bell filed a joint pleading recognizing that, while this suit was pending, the PUC was adjudicating the *very same issues presented in the instant case.* In fact, the very same attorneys participated in these state proceedings in January 1992. It is ludicrous, almost to the point of frivolity, for Metro to contend that the PUC does not actively supervise the conduct in question given the fact that Metro and Bell are awaiting a PUC decision on Bell's actions "as we speak."

---

[29]Docket 8585, *Inquiry of the General Counsel Into the Reasonableness of the Rates and Services of Southwestern Bell Tel. Co.,* 17 PUC BULL. 1045 (Nov. 29, 1990, on rehearing Jan. 10, 1991).

[30]Docket 6200, *Petition of Southwestern Bell Tel. Co. for Authority to Change Rates,* 14 PUC BULL. 490 (June 26, 1986); Docket No. 5220, *Petition of Southwestern Bell Tel. Co. for Authority to Change Rates,* 10 PUC BULL. 255 (May 14, 1984); Docket No. 5113, *Phase I: Petition of the Pub. Util. Comm'n for an Inquiry Concerning the Effects of the Modified Final Judgment and the Access Charge Order Upon Southwestern Bell Tel. Co. and the Independent Tel. Cos. of Texas,* 13 PUC BULL. 493 (July 2, 1984) (motion for reh'g denied, Aug. 6, 1984); Docket No. 4545, *Petition of Southwestern Bell Tel. Co. for Authority to Change Rates,* 8 PUC BULL. 173 (Jan. 3, 1983); Docket No. 3920, *Application of Southwestern Bell Tel. Co. for Authority to Increase Rates,* 6 PUC BULL. 719 (Dec. 11, 1981); Docket No. 3340, *Application of Southwestern Bell Tel. Co. for Authority to Increase Rates,* 6 PUC BULL. 627 (Jan. 29, 1981); Docket No. 2672, *Application of Southwestern Bell Tel. Co. for Authority to Change Rates,* 5 PUC BULL. 163 (Nov. 9, 1979); Docket No. 1704, *Re: The Application of Southwestern Bell Tel. Co. For Authority to Change Rules,* 3 PUC BULL. 1758 (Aug. 2, 1978); Docket No. 78, *Re: The Application of Southwestern Bell Tel. Co. for Rate Increase,* 2 PUC BULL. 432 (Jan. 10, 1977).

[31]*See, e.g.,* Docket 7952, *Complaint of Metro-Link Telecom, Inc. Against Southwestern Bell Tel. Co.,* (Examiner's Report & Recommendation) (Dec. 18, 1990); Docket 7438, *Complaint of Metro-Net Against Southwestern Bell Tel. Co.,* 14 PUC BULL. 334 (May 20, 1988).

These indisputable public records make it abundantly clear that the Texas regulatory scheme is a far cry from the passive regulatory schemes at issue in *Ticor* which failed the *Midcal* test. The systems contested in *Ticor* provided virtually no actual state supervision, allowing rates to come into effect with only minimal review of some of the rates for mathematical accuracy.[32] Instead of featuring independent state ratemaking, the title insurance rates at issue were set by the title insurance industry itself, with no input from or control by the states. Obviously, under such schemes, the absence of any state involvement prevents the private conduct at issue from qualifying for anti-trust immunity under the state action doctrine.

The Texas public utilities regulatory scheme, by contrast, does not suffer from this flaw. The Texas system authorizes the state, through the Commission, to control the initial establishment of rates, rules and regulations of the utilities, and allows a complaining party to challenge the application of a particular rate through the PUC. And, more importantly, the record before us confirms that the PUC acts under that grant of authority with sufficient involvement to satisfy *Ticor*'s interpretation of the second prong of the *Midcal* test.

IV

CONCLUSION

That the Texas system meets the first prong of the *Midcal* test is a given in this latest chapter of the *Metro* litigation by virtue of the law of the case doctrine. And, when we view the "summary judgment evidence" in the record of the instant case as a whole, we conclude beyond serious question that the Texas regulatory scheme also satisfies the second or active supervision prong of the *Midcal* test as contemplated by *Ticor*. Bell is therefore entitled to anti-trust immunity. Consequently, Metro cannot state and has not stated a claim on which relief may be granted, so that the district court's dismissal of Metro's claim is in all respects proper.

AFFIRMED.

---

[32]*Ticor,* 504 U.S. at ----, 112 S.Ct. at 2179, 119 L.Ed.2d at 425.