BOYLE COUNTY STOCKYARDS COMPANY, Bourbon Stockyards Company, Kentucky-Tennessee Livestock Market, Clay-Wachs Stockyards, Inc., Kentuckian Livestock Market, Maysville Stockyards, Bowling Green Livestock Market, Farmers Stockyards, Franklin Stockyard Market, Paris Stockyards, Inc., Garrard Stockyards, Blue Grass Stockyards, Paducah Livestock Market and Mayfield Livestock Market, Appellants,

v.

COMMONWEALTH of Kentucky, DEPARTMENT OF AGRICULTURE, Thomas O. Harris, Commissioner of Agriculture and Dr. Tom S. Maddox, State Veterinarian, Appellees.

GRAYSON COUNTY STOCKYARDS MARKETS, INC. and Taylor County Stockyards, Appellants,

v.

COMMONWEALTH of Kentucky, DEPARTMENT OF AGRICULTURE, Thomas O. Harris, Commissioner of Agriculture and Dr. Tom S. Maddox, State Veterinarian, Appellees.

Court of Appeals of Kentucky.

April 21, 1978.

Rehearing Denied June 30, 1978.

Discretionary Review Denied Oct. 3, 1978.

James F. Clay, Clay & Clay, Danville, Wayne J. Carroll, Ewen, McKenzie & Peden, Louisville, for appellants.

Robert F. Stephens, Atty. Gen., William H. Mohr, Asst. Atty. Gen., William E. Johnson, Johnson, Judy & Gaines, Frankfort, for appellees.

Before HOWERTON, LESTER and WINTERSHEIMER, JJ.

HOWERTON, Judge.

This is an appeal from a judgment by the Franklin Circuit Court, upholding the validity of an administrative regulation relating to the testing of livestock for brucellosis.

Pursuant to the duties and power set forth for the Board of Agriculture, in relation to livestock disease control, in Chapter 257 of the Kentucky Revised Statutes, the Board adopted a regulation requiring brucellosis tests for all livestock at stockyards. The regulation was declared void for being vague, incomplete and for containing irreconcilable conflicts. A new regulation was quickly prepared and given immediate effect by executive order of the lieutenant governor. The appellants, in appeal CA–1318–MR, attacked the new regulation on the same grounds that they had attacked the prior regulation. In this litigation, the trial court found the modified regulation to be clear, and to be a valid and reasonable exercise of the state's police power. The appellees sought enforcement of the regulation, and received a judgment against the appellants in CA–1583–MR, on the basis of the judgment entered in CA–1318–MR.

The regulation, 302 KAR 20:070, as amended, reads in part as follows:

Section 5. Cattle Requirements.

.    .    .    .    .

(2) Brucellosis:

(a) All cattle six (6) months of age or older offered for sale at the stockyard for breeding and dairy purposes, except for the following, shall be negative to an official brucellosis test within last eight (8) days of sale:

1. Official vaccinates identified by official tattoo, twenty-four (24) months of age and under, if a beef animal, and twenty (20) months of age or under if a dairy animal, provided heavy springers and females post partum shall be negative, regardless of age at time of sale.

2. Cattle from a certified herd.

(b) Backtagged cattle:

1. All mature cattle eighteen (18) months or older, as indicated by the presence of the first pair of permanent incisor teeth, except steers and spayed heifers, consigned to any stockyard, or purchased direct by any slaughtering establishment shall be backtagged in a routine manner prescribed by the Department.

2. All backtagged cattle shall be negative to a brucellosis test within eight (8) days of sale.

3. Backtags placed on slaughter cattle shall not be removed at any time, or by any person, only under specific instructions from the chief livestock sanitary official.

4. Backtagged cattle shall proceed directly to a recognized slaughtering center, with no diversion whatever enroute, except to another approved stockyard for reconsignment to slaughter.

5. Materials for the backtagging program shall be furnished by the department and/or Animal and Plant Health Inspection Service, Veterinary Services, United States Department of Agriculture.

(c) All breeding, dairy and backtagged cattle requiring testing shall be tested at the first point of assembly or concentration.

(d) Cattle of beef breeds between the ages of six (6) and eighteen (18) months sold for feeding and grazing shall be exempt from brucellosis test unless they are heavy springers or females post partum.

The issues raised by appellants challenge the constitutionality of the amended regula-

tion on the ground that it constitutes a taking of private property without just compensation, and that it is an unreasonable exercise of police power. The appellees restate the issues, but are nevertheless concerned with the same two points. The appellees raise the question of whether or not the regulation is a necessary and reasonable regulation, and then ask, "If the regulation is reasonable and necessary, does the fact that its enforcement may create some peculiar individual hardship and difficulty of compliance make it unconstitutional?"

Before specifically addressing the questions raised by the parties, we should consider the facts as established by the evidence. The evidence presented by appellants would have us believe that brucellosis is not a problem, and that enforcement of the regulation would bring financial disaster upon all of the stockyards. On the other hand, the evidence presented by the appellees would have us believe that brucellosis is a very serious problem and that enforcement of the regulation would be of no consequence to many stockyards, and of relatively little consequence to other stockyards because of financial support for the enforcement program from federal funding. The facts, as found by Judge Squire Williams, are certainly supported by the evidence, and in order not to add or detract from the accuracy of his findings, we will quote extensively from his opinion.

> It has been testified that this regulation is being implemented to, among other things, benefit the farmer. We are told the farmer will lose untold numbers of dollars without this program. On the other hand, we are also told that each animal subjected to testing will lose several pounds due to shrinkage at a substantial loss to the farmer. The fact is that although the farmer will benefit, it is the public, generally, which is the real beneficiary. We note the farmer, who is the producer, can avoid any weight loss from shrinkage by insisting on a weigh-in rather than a weigh-out operation. Further, if the testing were done on the farm, where it should be, the weight loss problem would not arise.

The procedure now followed is that all dairy and other testable animals, those going back to the farm, are tested at the stockyards. The others, backtagged animals, the slaughter animals, are not tested *but* as soon as they are slaughtered, blood is drawn and tests are conducted. The Federal government supervises the drawing the blood. There are means to control the movement and to maintain the identity of the animals. The tests are simple and could as easily be conducted at slaughterhouses as at stockyards. But, we are told the present system doesn't work because the integrity of the blood samples is not maintained, and the test results are slow and not always accurate. With the Federal government directly involved, we really do not understand how the whole issue can be treated so cavalierly. However, we accept testimony that the program is not effective, that brucellosis is not being controlled, and that it is necessary to implement a new procedure. We look to the latest amendment.

At the first hearing it appeared to the Court that the burden of the first point testing rested so heavily upon the stockyards as to be an unreasonable exercise of the police power. However, the latest regulation does not mandate several objectionable steps which, whether real or fancied, were required by the earlier regulation. For example, there is no requirement that testing be done before the sale; there is no necessity to keep each consignment as a unit; there is no necessity to test that motley group of animals from six (6) months of age up, including steers and spayed heifers, etc. As heretofore stated, this regulation is now clear and unambiguous.

So, we are faced with the crucial question of whether the financial burden on the stockyards is so great as to indicate an unreasonable and arbitrary exercise of the police power. Essentially, the regulation is quite simple. It demands that all testable animals be tested at the stockyards. There is no attempt to dictate

when or how it shall be done. New or remodeled chutes and pens apparently must be constructed. More labor costs will be a natural result. New methods and new procedures may become necessary. Virtually every witness testified it would be a financial burden on each stockyard. One witness even testified that he could not do it. Most of the others did not go that far, but predicted severe financial effects. Especially hard hit, are those with no room to expand, and the larger ones. At first blush, it almost appears that Bourbon Stockyards is dealt a near fatal blow, but when we realize that Bourbon is tantamount to five yards in one, the burden does not appear unreasonable. Admittedly, it will be hard, but it can and must be done. The same must be said for Blue Grass, Clay-Wachs, and the others.

At this time, there are about thirty-seven (37) stockyards in the state already doing first point testing. Several stockyard men from other states testified they are now, and have been for some time, following that procedure. The Federal government has apparently agreed to pay the stockyards 50 cents for each tested animal. This will, in some small measure, alleviate the burden. There is other financial sop going to the veterinarians and to the producers who lose an animal to brucellosis. If this program is successful as the defendants [appellees] say it will be, it can be abandoned in about three years.

As heretofore stated, we originally feared the stockyards were being asked to shoulder too much of a burden. However, in view of the fact the latest regulation does not place any of the former onerous duties on them, and balancing the good that will inure to the public, we are of the opinion the regulation is a reasonable exercise of the police power. With the control of brucellosis and the attendant increase in the number and quality of cattle, the producer, the stockyard, others directly involved, as well as the general public, will be greatly benefited.

Appellants attack the constitutionality of 302 KAR 20:070, but the allegation that the exertion of the police power deprives one of property without compensation is basically an assertion that the act or regulation violates Section 2 of the Kentucky Constitution, which prohibits the exercise of absolute and arbitrary power. *Moore v. Ward*, Ky., 377 S.W.2d 881 (1964), and *Pritchett v. Marshall*, Ky., 375 S.W.2d 253 (1963). The question of constitutionality therefore requires us to examine the reasonableness of the regulation which may result in a "taking of property."

What is now our Supreme Court was confronted with a similar problem when considering a program requiring the fluoridation of water. In *Graybeal v. McNevin*, Ky., 439 S.W.2d 323 (1969), the Court provided, at 326, "On the issue of arbitrariness, the burden was on the plaintiff to show that the regulation had no reasonable basis in fact, or had no reasonable relation to the protection of the public health."

The exercise of police power frequently involves the taking or limitation of property rights. A recent case illustrates the fact that a business may be lawfully destroyed or prohibited through the exercise of police powers. *Stephens v. Bonding Association of Kentucky*, Ky., 538 S.W.2d 580 (1976). The right to conduct a business is subordinate to police powers when they are exercised in a reasonable manner in the public interest. *Jasper v. Commonwealth*, Ky., 375 S.W.2d 709 (1964).

The regulation was prepared pursuant to the authority of KRS Chapter 257. The purpose was to improve the program from one of brucellosis control to one of brucellosis eradication. Evidence supported its necessity in order to locate infected animals at the stockyards prior to their movement to other places; to locate animals which have come in contact with infected animals; to prevent infected and exposed cattle from being released to spread the disease; and, to avoid the expense of tracking suspected animals at a later time. Also, the program is needed to lift several restrictions on the transportation of cattle from Kentucky, known as a "dirty" state, to other states.

The regulation and program appear reasonable in that evidence supports the facts that the program has worked in other states, and there is no evidence that any stockyard has been put out of business because of any economic burden due to the enforcement of the testing program. Furthermore, in many states, no financial assistance has been provided to stockyards, but due to the implementation of the eradication program in Kentucky, $1,411,000.00 of federal funds has been allocated for Kentucky. Three hundred fifty thousand dollars ($350,000.00) has been designated for the brucellosis program.

We wish to make this point clear, however. We are not determining that the testing program is reasonable because the Commonwealth will receive nearly one and a half million dollars. We might note, however, that the fact that. the Federal government is encouraging and assisting such a program is some evidence of a determination of public necessity. In *Moore v. Ward, supra,* which upheld the exercise of police power to control billboards, the Court's opinion, at 887, reads, "The fact that the federal congress and federal authorities have deemed this type of regulation as beneficial to the public is also a factor in determining public necessity."

Appellants rely on *Adams, Inc. v. Louisville and Jefferson County Board of Health,* Ky., 439 S.W.2d 586 (1969), to support their contention that 302 KAR 20:070 is invalid as an unreasonable exercise of the police power. Judge Williams considered the *Adams* case, *id.,* and found it to be "of little succor here." In any situation such as this, the question of reasonableness is one of degree and must be based on the facts of a particular case.

In *Adams, id.,* regulations were promulgated for the safe and healthy operation of swimming pools. Only two classifications were specified. One was for home-owner pools, and the other was for all other pool facilities. The regulations required all public facilities, including those at an apartment complex, to secure not only a trained lifeguard, but an additional attendant to insure that bathers had taken a shower prior to using the pool, and to provide separate entrances and exits for men and women. Facilities were also required to insure that bathers passed restrooms and a shower before entering the pool. Although it is obvious that cost would be involved in complying with the regulations, the Court's decision did not turn on a dollar sign. The Court held that a single classification for all such pools was so broad that the regulation "does not bear a reasonable relationship to its avowed purpose." *Adams, id.,* at 592.

The only complaint that is seriously expressed by the appellants is cost, but cost figures alone are irrelevant, and they must be balanced with the public necessity to be meaningful. In this sense, we would have to agree with the appellee's argument that neither peculiar individual hardship (which might involve cost), nor difficulty in compliance is sufficient constitutional objection unless the public interest at stake is shown to have no reasonable relationship to the regulatory program.

Judge Williams concluded that he had considered cost, custom and necessity, and found that necessity outweighed any other consideration. We find no reversible error in his findings and conclusions.

We must therefore affirm the judgment of the trial court in both appeals.

All concur.