KENTUCKY MILK MARKETING AND ANTIMONOPOLY COMMISSION, Commonwealth of Kentucky, Niels O. Ewing, Bob J. Rickard, Lloyd Cassity, Leslie Manley, Kenneth Rushing and James E. Claycomb, Appellants,

v.

The KROGER COMPANY, Appellee.

Supreme Court of Kentucky.

May 2, 1985.

Rehearing Denied July 3, 1985.

John B. Baughman, Hazelrigg and Cox, Frankfort, John S. Palmore, Henderson, for appellants.

O. Grant Bruton, Kenneth S. Handmaker, C. Kent Hatfield, and Kendrick R. Riggs, Middleton & Reutlinger, Louisville, for appellee.

STEPHENS, Chief Justice.

The basic issue we resolve on this appeal is the constitutionality of the so-called Kentucky Milk Marketing Law, KRS 260.675 to KRS 260.760, (1960).[1]

## PROCEDURAL HISTORY

On September 18, 1982, the Commission, following a hearing, entered an order

---

**1.** The Appellants Ewing, Rickard, Cassity, Manley, and Rushing are the members of the Kentucky Milk Marketing and Antimonopoly Commission and Appellant Claycomb is the execu-

which found Kroger in violation of KRS 260.705 [2] and levied a $4,500 fine against it. This action was filed on October 4, 1982 in the Franklin Circuit Court and was initially an appeal of that order pursuant to KRS 260.745. On the same day, the trial court, *ex parte*, entered a restraining order which enjoined the Commission from enforcing its order; from conducting any further investigation or hearings for violations of the law; and from enforcing any rules, regulations or orders against Kroger. Shortly thereafter, Kroger filed an amended complaint which, through the vehicle of a declaratory judgment, KRS 418.040, challenged the constitutionality of the entire Kentucky Milk Marketing Act. The suit is therefore in the nature of an appeal and a declaratory judgment.

Following the voluntary recusal of the regular Franklin County circuit judges, we appointed Honorable George M. Barker as special judge. On a motion by the Commission to dissolve the restraining order, the trial judge heard proof relevant to the merits.[3] Although the court ruled that Kroger was not entitled to a temporary injunction and dissolved the restraining order, it ruled that Kroger was entitled to partial relief; viz., a stay of the Commission's order during the pendency of the action on the merits. This order was entered on January 5, 1983.

## RULING OF THE TRIAL JUDGE

Following submission of the case on the merits, the trial judge ruled, on August 26, 1983, as follows:

(1) KRS 260.675 to KRS 260.700, and all regulations and practices related thereto were invalid as being in violation of the Sherman Anti-Trust Act, 15 USC Sec 1 *et seq.*

(2) The statute, regulations and practices were also invalid and unconstitutional as being in violation of Sections 1 and 2 of the Kentucky Constitution.

(3) The Commission and all its officers and employees were permanently restrained from enforcing the Kentucky Milk Marketing Law and any and all regulations and practices promulgated pursuant thereto.

The judgment found Kroger not guilty of the offense charged by the Commission.

An appeal was filed by the Commission and, upon appropriate motion and for obvious reasons, we transferred the case to this Court.

## CONTENTIONS OF APPELLANTS

On appeal, the Commission alleges: (1) that the Kentucky Milk Marketing Law is not in violation of the Sherman Anti-Trust Act; (2) that the trial court erred in holding that Kroger met its burden of proof; (3) that the Kentucky Milk Marketing and Antimonopoly Commission does not violate Sections 1 and 2 of the Kentucky Constitution; (4) that the federal courts have exclusive jurisdiction of all matters involving the Sherman Anti-Trust Act; (5) that the judgment of the trial court should be reviewed with respect to the appellants, *as individuals,* and (6) that those specific provisions of the Kentucky Milk Marketing and Antimonopoly Commission which were declared unconstitutional are severable.

We disagree and affirm the judgment of the trial court. Because we decide this case on the basis of the Kentucky Constitution, we need not discuss contentions (1) and (4), which relate to the Sherman Anti-Trust Act.

## THE REGULATION OF THE DAIRY INDUSTRY

In order to guarantee that the consuming public has an adequate supply of whole-

tive director thereof. For convenience, Appellants will hereinafter be referred to as Commission and Appellee will be referred to as Kroger.

**2.** This statute and the entire Milk Marketing Act will be analyzed at a later point in this opinion.

**3.** The trial court heard all proof at that hearing except a deposition covering a study of the Kentucky Milk Marketing and Antimonopoly Commission.

some milk and milk products, government has long been regulating the dairy industry. Marketing conditions in the late 1930's led to federal and state legislation to bring purity and stability to milk products. Federal marketing orders [4] provide a minimum price which must be paid to *farmers* for the milk they sell. These orders do not guarantee a sale of milk, but do guarantee a minimum price in the event of sale. Under the federal program, milk which is not sold is purchased by the Federal Government and is generally made into butter or cheese, then stored and ultimately given away.[5]

### *The Kentucky Milk Marketing Law*

As noted, KRS 260.675 to KRS 260.760 (1960) inclusive, is known as the "Milk Marketing Law."

In summary, this law prohibits any distributor, processor, bulk milk handler, store, or producer-handler from engaging in any marketing practice established as unreasonable by the Commission (or the Act), *for the purpose or with the effect of restraining, lessening or destroying competition* or injuring one or more competitors or injuring one or more persons dealing in milk production or to impair or prevent fair competition in the sale of milk and milk products. KRS 260.705. Specifically, this section of the Act prohibits selling *"below cost"* for the purpose of injuring or destroying competition or with the effect of otherwise injuring a competitor, or destroying competition, or of creating a monopoly. KRS 260.705(a).

Farmers, as producers of milk, are not affected by the law. The place it first

touches is at the level of so-called processor-distributors.[6] The processor-distributors are required to file with the Commission price schedules which can only be superseded, changed or withdrawn on forms prescribed. KRS 260.710. Regulations of the Commission require that price changes be filed at least twenty (20) days in advance of the proposed effective date. Although the Commission, under restrictions set out in KRS 260.710, may not set or establish a price for the regulation of milk products, *it does have the authority to review price schedules to insure that no processor-distributor is selling below cost.* Thus, KRS 260.705(1)(a) limits and forbids a practice which would:

> "advertise for sale any article or product *at less than the cost thereof to such vendor ..."* (Emphasis added).

In the case of processor-distributors, KRS 260.680(12) defines "cost" as follows:

> "Cost to the processor or distributor" means the price paid for raw materials, plus the cost of doing business, as evidenced by the standards and methods of accounting regularly employed by such processor or distributor. The cost of doing business means all costs of doing business incurred in the conduct of the business and shall include without limitation that following items of expense: labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, power, supplies, maintenance of equipment, selling costs, transportation, delivery cost, credit losses, all overhead expense, and all types of licenses, taxes, insurance and advertising, ....

In the case of retailers, KRS 260.680(17) defines "Cost" as follows:

---

**4.** Promulgated under the authority of the Agriculture Marketing Administration Act of 1937.

**5.** We will not unduly lengthen this opinion to discuss the philosophical merits/demerits or the necessity or efficacy of this program, *or,* for that matter, of the Kentucky Milk Marketing Law. Our function, obviously, is to test the content of the Kentucky Milk Marketing Law, and its enforcement by the Commission, by the standards set up by our Constitution.

**6.** The definition section of the Act, KRS 260.680, defines "producer" as "every person who produces milk or cream from cows and thereafter sells the same as milk, cream, or other dairy products." Subsection (10) defines a distributor as a person engaged in the business of distributing the milk products at *wholesale or retail to consumers,. stores or other distributors.*

"Cost to the store" means the invoice price paid by the retailer plus the retailer's cost of doing business, as evidenced by the standards and methods of accounting regularly employed by such store, including, but not limited to, all costs incurred in the conduct of said store such as labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, power, supplies, maintenance of equipment, selling costs, advertising, transportation, delivery costs, credit losses, all overhead expenses, and all types of licenses, taxes, insurance and advertising;

KRS 260.715 sets forth the powers and duties of the Commission. The relevant provisions therein authorize an investigation and hearing in response to alleged violations of the Milk Marketing Law or the regulations enacted pursuant thereto. The Commission has the specific authority to *suspend or revoke* the licenses of processor-distributors and retailers. KRS 260.735. It also has the power to impose fines up to $500 for each violation, and to imprison violators for not less than 1 day nor more than 30 days. KRS 260.991.

In essence, the ostensible purpose of the Milk Marketing Law is to prevent any practices that would tend to eliminate competition or tend to create a monopoly. By legislative fiat, one proscribed practice the statute says tends to create a monopoly or unfair competition is the sale of milk products below cost. KRS 260.680(17); KRS 260.710.

In a well-reasoned opinion, the trial court found from the evidence presented that the Kentucky Milk Marketing Law, *as administered by the Commission,* is, in actuality, not an anti-monopoly law but rather, a minimum retail mark-up law. In so finding, the trial court in effect applied the old adage, "If it walks like a duck and quacks like a duck, it is a duck." We agree.

In prohibiting sales "below cost", the statutory definition of "cost to the store" includes the *invoice price paid by the re-* tailer, *plus* his cost of doing business, including (but not limited to): *all cost incurred in the conduct of said store* such as labor, salaries, rent, interest, depreciation, power, supplies, maintenance, selling cost, advertising, transportation, delivery cost, credit losses, *all* overhead expenses, and *all* types of licenses, taxes, insurance and advertising. The evidence is incontrovertible that many, if not all, of the costs incurred by grocery retailers have nothing to do with the actual cost of selling milk. According to the evidence, the procedure used by the Commission requires the seller to submit all costs incurred by the stores in terms of a percentage of gross sales, (less sales and excise taxes). Prior to this litigation the minimum legal price was determined by adding that percentage to the invoice price of the milk, to determine the "cost" that was proper, as not being *"below cost."* The method was changed to require that the proposed selling price be multiplied by the percentage, with the result being added to the invoice price of the milk. If the result was *less* than the proposed selling price, the price was legal. If, however, the result was *greater* than the proposed selling price, then the proposed price was illegal.

A review of the proceedings of the Commission for the previous thirteen (13) years reveals that it followed the statutory definition. However, in a directive to all retail stores, dated May 19, 1974, the appellant, Claycomb, as Executive Director of the Commission, declared that a figure of fifteen (15) percent over the invoice cost of milk would ... "be needed in order for the retailer to realize *a reasonable profit* on the sale of the product." Apparently recognizing that this directive revealed the real purpose of the Act, the Commission rescinded it on September 15, 1975. The trial court found, and we agree, that the "mark up" required does include an actual profit over and above the cost of selling milk products.

It is understandable that the *cost* of selling items in the grocery department (in-

cluding milk) is lower than any other department of a grocery store. In the case of Kroger, it is 4% in the grocery department, 15% in the produce department, and 30% in the delicatessen. The evidence also shows that, in the case of Kroger, and most supermarkets, over 8,000 items are offered for sale to the public. Under the Kentucky Milk Marketing Law, only three of those items are singled out for special treatment as to price control.

That the Kentucky Milk Marketing Law mandates a minimum mark-up, including a profit, is even more clear by noting what happens as the result of an increase *in the invoice price of milk*. As an example, it was shown that if the invoice cost of a gallon of ice cream was increased from $1.65 to $1.75, the law as applied would require an increase in selling price from $2.05 to $2.19. As the trial court opined, "obviously, the cost of selling the ice cream could not have increased but the law requires the consumer to pay 14 cents more for the product because of a 10 cent increase in price."

Under these circumstances, we have no problem in concluding that the Kentucky Milk Marketing Law, while ostensibly and facially an anti-monopoly law, is in actuality and practice, a minimum mark-up law.

## FACTUAL BACKGROUND OF THIS LITIGATION

With our analysis of the Kentucky Milk Marketing Law, it is now appropriate to recite the facts which gave rise to the actions of the Commission against Kroger, and this resultant litigation.

On July 2, 1982, a letter was sent by a competitor of Kroger to the Commission complaining that Kroger was selling vanilla

ice cream at $1.99 per gallon. Following the complaint, the Commission notified Kroger that a formal hearing would be held and requested a factual justification for this price, viz., that the item was not being sold "below cost." At the hearing, Kroger established its dock cost was 1.65 per gallon. Kroger further established that its total store expense was 16.61% of sales and its advertising, warehousing and transportation expense amounted to an additional 3.45% of sales, thus setting the total cost of doing business at 20.06% of sales. This percentage, when applied to the dock cost, made a total cost of $1.99 per gallon. The Commission rejected this formula, requiring that the percentage of cost be multiplied by the *selling price* of $1.99, which, when added to the dock cost of $1.65, made the minimum legal price of $2.05 per gallon.

Kroger, in the course of business, acts as its own processor-distributor. As such, it is not required to file a price schedule, and thus technically has no *invoice cost* of its product. It has been the custom of the Commission in similar situations to accept the "certified cost"[7] in the product data submitted by the retailer. This was not done in this case.

Strangely enough, there are no rules or regulations published by the Commission which establish the proper procedures to set a minimum retail sales price. Appellant Claycomb testified that there were two methods of establishing certified cost used by the Commission, *one of which would have justified* Kroger's price. However at the hearing, appellant Ewing, who is interestingly enough a competitor of Kroger, ruled that the other method should be used.[8] Yet no reason was given, nor indeed is one apparent, as to why this other

---

7. In this case the cost, as stated, is $1.65.

8. Ewing was Vice-Chairman of the Commission and even though he was a competitor of Kroger

he did not recuse himself at the hearing, though he had done so in other cases involving his company's competition.

method was used.[9] Additionally, it is clear that the Commission has the legal authority to promulgate regulations on such matters. *Kentucky Milk Mktg. & Antimonopoly Commission v. Borden Co.*, Ky., 456 S.W.2d 831 (1970). It seems that fairness and objectivity would require that such be done.

Based on these facts, the trial court found that the Commission's finding that Kroger was guilty of selling "below cost" was arbitrary and capricious, and found Kroger not guilty.

## IS THE KENTUCKY MILK MARKETING LAW VIOLATIVE OF KENTUCKY CONSTITUTION, SECTION 2

Section 2 of our Constitution is simple, short and expresses a view of governmental and political philosophy that, in a very real sense, distinguishes this republic from all other forms of government which place little or no emphasis on the rights of individuals in a society. It is as follows:

"**§ 2. Absolute and arbitrary power denied.** *Absolute and arbitrary power over the* lives, liberty and *property of free men exists nowhere in a republic, not even in the largest majority.*" (Emphasis added).

While there are numerous cases which have been decided on the basis of this bulwark of individual liberty, the number is relatively few, in view of its potential importance to our jurisprudence.

■ Section 2 is a curb on the legislature as well as on any other public body or public officer in the assertion or attempted exercise of political power. *Sanitation Dist. No. 1 v. City of Louisville*, 308 Ky. 368, 213 S.W.2d 995 (1948). Whatever is contrary to democratic ideals, customs and maxims is arbitrary. Likewise, whatever is

essentially unjust and unequal or exceeds the reasonable and legitimate interests of the people is arbitrary, *Id.* No board or officer vested with governmental authority may exercise it arbitrarily. If the action taken rests upon reasons so unsubstantial or the consequences are so unjust as to work a hardship, judicial power may be interposed to protect the rights of persons adversely affected. *Wells v. Board of Education of Mercer County*, Ky., 289 S.W.2d 492, 494 (1956). Our function is to decide a test of regularity and legality of a board's action by statutory law and by the constitutional protection against the exercise of arbitrary official power. *Id.*

■ Section 2 is broad enough to embrace the traditional concepts of both due process of law and equal protection of the law. *Pritchett v. Marshall*, Ky., 375 S.W.2d 253, 258 (1963). Unequal enforcement of the law, if it rises to the level of conscious violation of the principle of uniformity, is prohibited by this Section. *City of Ashland v. Heck's, Inc.*, Ky., 407 S.W.2d 421 (1966); *Standard Oil v. Boone County Bd. of Sup'rs*, Ky., 562 S.W.2d 83 (1978). The question of reasonableness is one of degree and must be based on the facts of a particular case. *Boyle Cty. Stockyards Co. v. Commonwealth, etc.*, Ky.App., 570 S.W.2d 650 (1978).

■ The majority of this Court believes that the Kentucky Milk Marketing Law, on its face, and in its enforcement by the Commission in this particular case, is violative of Section 2 of the Kentucky Constitution.

As we have previously said,[10] the statutory purpose of the law is to prevent monopolies and unfair practices in the sale of milk and milk products. As we have also said, the law is in reality and in practice not an anti-monopoly statute, but is rather a

---

**9.** The evidence also shows that the standard which would have justified Kroger's price had been generally used by the Commission.

**10.** See discussion of the nature of Kentucky Milk Marketing Law, *supra*.

minimum mark-up law. We believe an enactment of such a nature is an arbitrary exercise of power by the General Assembly over the lives and property of free men.

■ Even though we decide this case on Kentucky Constitutional grounds, we are cognizant that minimum mark-up laws (unless authorized as state action) are violative of the Sherman Anti-Trust Act. *Alcoholic Beverage Control Board v. Taylor Drug Stores*, Ky., 635 S.W.2d 319 (1982). The effect of the Kentucky Milk Marketing Law is price fixing by requiring minimum mark-ups. This certainly, by any criteria, is arbitrary and is inimical to the public interest. It is an invasion of the *right of merchants to sell competitively*, and of the public to buy competitively in the open market.

In the case of *General Electric Co. v. American Buyers Cooperative*, Ky., 316 S.W.2d 354 (1958), we held sections of Kentucky's Fair Trade Act unconstitutional. The Act enforced price fixing not only against parties to a minimum resale agreement, but also against a nonsignee if he knowingly breaches a resale agreement which was made between the producer and a third person. In effect the statute approved agreements by which a producer could require purchaser-retailer to resell the property at a certain invoice mark-up. In language relevant to the present case, we said:

> Our Bill of Rights declares as one of "the great and essential principles of liberty and free government" and as "inherent and inalienable ... the right of acquiring and protecting property" ... This is free enterprise. Our economic system is founded upon competition— "the life of trade." It is an established principle that the constitutional guaranty of the right of property protects it ... from any unjustifiable impairment or abridgement of this right, such as depriving the owner of any of its essential attributes or such as restricts or interrupts its common necessary or profitable

use.... *The right of the owner to fix the price at which his property shall be sold is an inherent attribute of the property itself ..."*

Supplemental to this property right provision is § 2 of the Constitution which forbids the exercise of arbitrary power of government over the "property of free men." (Emphasis added). *Id.* at page 360.

The Kentucky Milk Marketing Law, whether interpreted as a minimum mark-up law or interpreted as simply requiring that a retailer may not sell "below cost", is clearly an arbitrary interference with "the right of the owner to fix the price at which his property shall be sold." *Id.* It is an arbitrary interference with the free flow of commerce—the free enterprise system— and is not justified or to be justified by the police power of the state. It is clearly a violation of the letter and spirit of Section 2 of our Bill of Rights.

## WAS THE KENTUCKY MILK MARKETING LAW ADMINISTERED IN AN ARBITRARY MANNER SO AS TO BE VIOLATIVE OF KENTUCKY CONSTITUTION, SECTION 2

Appellants argue that Kroger did not meet its burden of proof in declaring the Kentucky Milk Marketing Law unconstitutional. We are well aware that the presumption of constitutionality of a statute is axiomatic. *Walters v. Binder*, Ky., 435 S.W.2d 464 (1968). It is sufficient to say that we believe the Milk Marketing Law is clearly in violation of Section 2 of the Kentucky Constitution and that the presumption of constitutionality has been overcome.

■ As we previously have said, the Kentucky Milk Marketing Law, in being administered by the Commission, has been treated as a minimum retail mark-up law. There have been no forms or standardized procedures provided by the Commission which would enable a respondent to justify his selling cost. The formula used by the

Commission for many years was, without reason or explanation, changed by the Commission in this particular case. Vice-Chairman Ewing, even though he had regularly recused himself when competitors were involved in the past, failed to do so in this particular case. As we have also said, the Commission, without reason or explanation, refused to accept Kroger's "invoice cost" per gallon, even though it regularly had done so in similar situations in the past. Moreover, the order handed down by the Commission contained no findings of fact. Based on these facts, the trial court held, and we agree, that the Commission finding Kroger guilty of a statutory violation was "arbitrary and capricious, prejudicing the sustantial rights of (Kroger)."

## ARE ANY PROVISIONS OF THE KENTUCKY MILK MARKETING LAW SEVERABLE

The trial judge declared the *entire* Milk Marketing Law unconstitutional. Appellants (then defendants) did not properly argue or address the question of severability to the trial court, only raising the issue after filing a notice of appeal.[11] Under the circumstances, the issue is not properly before us. *Hoy v. Newburg Homes*, Ky., 325 S.W.2d 301 (1959).

However, we are constrained to state that an examination of the existing Kentucky Milk Marketing Law, specifically KRS 260.705, which sets out the *purpose* of the Act, clearly shows that the prohibited "marketing" practices deal with pricing and selling of milk and milk products. KRS 260.705(1)(a) prohibits the sale "at less than cost thereof"; KRS 260.705(1)(b) prohibits the sale of such products at different prices in different geographical ar-

eas; KRS 260.705(1)(c) prohibits rebates, etc., when such products are sold. KRS 260.705(3) limits the amount of advertising material that shall be given to the retail stores. KRS 260.705, in its entirety, relates to the selling of milk, milk products, and the sales price, the method of selling, and advertising provided by sellers. All of the practices it prohibits and restricts deal with the ability of a seller to merchandise and sell his products in a free economy. Its provisions quite simply restrict the free market and, in so doing, violate the public's interest and are arbitrary.

The entire Act, from its definition section to its penalty section, has the purpose of enforcing the provisions of KRS 260.705. We conclude, therefore, that all parts of the statute are essentially and inseparably connected, and not severable.

## ARE THE APPELLANTS, AS INDIVIDUALS, LIABLE FOR COSTS

In its judgment, the trial court, in paragraph 5 thereof, declared:

"Plaintiff shall have Judgment against Defendants, jointly and severally, for its costs herein expended, for which execution may issue."

Appellants argue that they should not, as individuals, be personally responsible for the court costs thus assessed. We agree. The case, as initially filed, was an *appeal* from the action of the *Commission*. KRS 260.745. The action as amended, was a declaratory judgment, challenging the constitutionality of the Milk Marketing Law. It is well established in Kentucky that state officers, or quasi-judicial officers when acting within the scope of their authority are not personally liable for damages sustained

11. The general severability statute is KRS 446.090 which states as follows: "It shall be considered that it is the intent of the general assembly, in enacting any statute, that if any part of the statute be held unconstitutional the remaining parts shall remain in force, unless the statute provides otherwise, or unless the remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the general assembly would not have enacted the remaining parts without the unconstitutional part, or unless the remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the intent of the general assembly."

by a member of the public as a result of their action unless they acted in a negligent manner. *J.F. Schneider and Son, Inc. v. Watt,* Ky., 252 S.W.2d 898 (1952); *Spillman v. Beachamp,* Ky., 362 S.W.2d 33 (1962); *Hall v. Midwest Bottled Gas Distributors, Inc.,* Ky., 532 S.W.2d 449 (1976). Under this maxim we therefore conclude that the trial judge erred in assigning costs against the appellants.

The judgment of the trial court is affirmed, but the case is remanded with directions to modify the judgment in a manner consistent with this opinion.

STEPHENS, C.J., LEIBSON, J., and WILLIAM L. SHADOAN and WILLIAM P. McEVOY, Special Justices, concur.

STEPHENSON, J., concurs in a separate opinion in which AKER and GANT, JJ., join.

STEPHENSON, Justice, concurring.

I agree that the practices of the Commission, as applied to Kroger in this situation, are clearly arbitrary in violation of Section 2 of the Kentucky Constitution. The opinion should stop there. The milk-marketing statute in its ostensible purpose, in my view, is constitutional. The express purpose is to forbid sales below cost for the purpose of injuring competitors, destroying competition, or of creating a monopoly. These are valid and constitutional reasons for state action in this field. Accordingly, I disagree with so much of the majority opinion as declares the statute itself unconstitutional. We should decide this case on the arbitrary practices of the Commission, which is the only issue presented.

AKER and GANT, JJ., join in this concurring opinion.