**Dexter COLEMAN; and Mark Cantrell, Appellants,**

v.

**Wendell SMITH, Administrator of the Estate of Rachel Roberts, Deceased, and Grandparent and Guardian of Courtney Paige Roberts and James Caden Roberts, Minor Children of the Deceased, Appellee.**

No. 2011–CA–001276–MR.

Court of Appeals of Kentucky.

Sept. 21, 2012.

Rehearing Denied Nov. 27, 2012.

Discretionary Review Dismissed by Supreme Court May 16, 2013.

**490**

Stacey A. Blankenship (argued), Douglas R. Moore, Paducah, KY, David Stratton (argued), Pikeville, KY, for appellants.

Gregory A. Belzley (argued), Prospect, KY, Robert A. Rowe, Jr., Prestonsburg, KY, for appellee.

Before ACREE, Chief Judge; CLAYTON, Judge; LAMBERT,[1] Senior Judge.

*OPINION*

ACREE, Chief Judge:

The narrow issue presented is whether either, or both, of the appellants, Dexter Coleman and Mark Cantrell, is entitled to qualified official immunity. We find Cantrell engaged in a discretionary act and, as a result, may qualify for official immunity. With respect to Coleman, we find he failed to comply with a ministerial directive but, because a genuine issue of material fact exists, summary judgment was premature. Accordingly, for the following reasons, we reverse the circuit court's June 28, 2011 order denying appellants' motion for summary judgment on immunity grounds and remand for additional proceedings.

### I. *Facts and Procedure*

At 10:30 a.m. on January 14, 2006, Rachel Roberts was arrested for public intoxication of a controlled substance and possession of drugs. The arresting officers transported Roberts to the Pike County Detention Center. Upon arrival, the officers notified the booking officer on duty, Deputy Jailer Kenny Rowe, of Ms. Roberts' charges and provided him a copy of the Uniform Citation relating to Roberts. At approximately 12:30 p.m., Rowe and Deputy Jailer Wanda McCoy booked Roberts into the Detention Center.

As part of the booking process, McCoy asked Roberts several screening questions. Among other questions, she was asked whether she had a serious medical condition that may require medical attention while she was at the Detention Center,

1. Senior Judge Joseph E. Lambert sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky (KRS) 21.580.

whether she had "recently ingested potentially dangerous levels of drugs or alcohol," and whether she had "ever experienced DTs or other serious withdrawal from drugs or alcohol." Roberts verbally responded in the negative to each of these questions. When asked if she understood she could request a healthcare provider at any time while she was at the Detention Center, Roberts responded that she understood. McCoy admitted she had to repeat several questions during this process because Roberts would "kind of look at [her] blank." Roberts signed her name, albeit with difficulty, at the bottom of the screening form.

The Detention Center's written policy, Policy 3–1, prohibits admitting an arrestee if he or she is unconscious, has a blood alcohol level greater than .30%, or "with evidence of serious illness, injury, [or] drug overdose." If an arrestee is denied admittance to the Detention Center, the arresting officer transports the arrestee to a local hospital for medical clearance. A second policy, Policy 3–4, prohibits keeping a detainee in a holding cell for more than four hours; after four hours, the detainee must be moved from the holding cell into the general population.

Cantrell was the shift supervisor and senior officer on duty, and was present at the booking desk when Roberts arrived. Cantrell observed that Roberts appeared to be intoxicated and her eyes were glassy. However, Cantrell did not think Roberts fit the profile or exhibited the characteristics of someone suffering from a drug overdose because she did not appear to have trouble answering questions when he saw her, and she was not having any trouble walking around. Likewise, Rowe did not believe Roberts was seriously impaired because she was walking and responded to

questions in a coherent manner. On the other hand, McCoy opined Roberts was so intoxicated she might need to go to the hospital for evaluation.

After Roberts was booked, she engaged in a twenty-minute interview with the arresting officers regarding the whereabouts of another suspect the officers sought to arrest. Roberts apparently answered the officers' questions "in a very coherent manner," told the officers she wanted to plea bargain her current charges, and expressed a desire that her children not to be in the house with the suspect they discussed when the arrest took place. The arresting officers described Roberts as cooperative and coherent during the interview.

After the police interview, McCoy fingerprinted and photographed Roberts, and placed Roberts in holding cell 129 which was located across from the booking desk. Roberts lay down and went to sleep. Jail employees checked on Roberts every twenty minutes [2] to ensure she was breathing, she had not hurt herself, and she had not done anything out of the ordinary. The employees performing the cell checks would physically walk to the door or window of the cell, look in, and check on the person, looking for anything out of the ordinary.

At 1:30 p.m., during one of the routine cell checks, Deputy Jailer Nathan Groves observed that Roberts had rolled off her floor mat. Groves reported the information to Cantrell, and both individuals went to Roberts' cell to help her back onto her mat. Cantrell claimed he called out Roberts' name a few times, and then "[s]he raised up and we slid the mat over away from the bench and she moved back over

**2.** The employees documented each check in the booking shift log. According to the log,

the only time Robert's cell check was not documented was at 8:40 p.m.

on her mat and laid [sic] back down."[3] When Cantrell and Groves left Roberts' cell, Roberts reportedly had her elbows on the mat, and was looking around the cell.

Cantrell's shift ended at 3:00 p.m., and Coleman replaced Cantrell as the shift supervisor. Up to this point, Coleman had not been present at the Detention Center. Before leaving, Cantrell informed Coleman that Roberts was in Cell 129, that she was charged with public intoxication, and that she was waiting to talk to pretrial services.

At 5:33 p.m., Corrections Officer Joseph Hall began serving dinner to occupants of the cells in the booking area. Upon entering Cell 129, Hall noted Roberts was sleeping and breathing loudly. Hall attempted to wake Roberts by verbally speaking to her, but she did not get up for dinner. Hall then informed Coleman that Roberts refused to eat.[4]

Another inmate, Jenna Bowling, was placed in the cell with Roberts at approximately 9:00 p.m. When Bowling entered the cell, Roberts was laying face down on her mat. Bowling called her name several times, but Roberts did not respond. Bowling then checked Roberts' vital signs, but could not find a pulse. Roberts was not breathing. Bowling knocked on the cell door, summoning help.

Coleman and Chris Edmonds, a Pikeville City Police Officer, immediately responded, but did not attempt CPR because Roberts' skin was cool to the touch, and her face was black and gray. McCoy called Emergency 911. A responding emergency medical technician was unable to perceive Roberts' vital signs and determined Roberts was dead. The Kentucky State Medical Examiner ultimately concluded Roberts died from a drug overdose, namely acute combined drug (hydrocodone and oxycodone) toxicity.

Appellee Wendell Smith, the administrator of Roberts' estate and guardian of her two minor children, filed a 42 U.S.C.[5] § 1983 action against the appellants and other parties not currently before this Court in the United States District Court for the Western District of Kentucky. The District Court subsequently granted appellants' motion for summary judgment and dismissed Smith's claim. *Smith v. Pike County, Ky.*, No. 06–257–ART, 2008 WL 3884331, at *1 (E.D.Ky. Aug. 18, 2008). The Sixth Circuit Court of Appeals affirmed the District Court's dismissal. *Smith v. Pike County, Ky.*, 338 Fed.Appx. 481 (6th Cir.2009).

While the federal appeal was pending, Smith brought this action to assert state claims that were left unresolved by the District Court's opinion. Smith's complaint alleged appellants' negligence and gross negligence caused Roberts' suffering and death while she was incarcerated in the Pike County Detention Center. Discovery followed.

The appellants then moved for summary judgment claiming, in part, they were entitled to qualified official immunity because the acts at issue were discretionary, thereby affording them immunity. The circuit court denied appellants' motion without explanation. Appellants promptly filed this

---

3. The parties dispute whether Cantrell physically helped Roberts move back onto the mat, or whether Cantrell simply moved the mat and Roberts, by her own effort alone, moved back onto the mat. The resolution of this dispute, however, is not of consequence to the issues on appeal.

4. The parties also dispute whether Roberts verbally responded to Hall's callings, or simply that her failure to respond was taken as a refusal to eat. Again, the resolution of this dispute is not material to the issues on appeal.

5. United States Code.

appeal challenging the circuit court's order.

## II. *Interlocutory Appeal*

■ At oral argument before this Court, appellee's counsel verbally moved to dismiss this case because it is an interlocutory appeal. Ordinarily, interlocutory orders are not appealable. *Druen v. Miller,* 357 S.W.3d 547, 549 (Ky.App.2011). However, "an order denying a substantial claim of absolute immunity is immediately appealable even in the absence of a final judgment." *Breathitt County Board of Education v. Prater,* 292 S.W.3d 883, 886 (Ky.2009). Appellee's motion to dismiss this appeal as interlocutory is, therefore, denied.

## III. *Standard of Review*

The circuit court's decision to grant summary judgment is reviewed *de novo. Harstad v. Whiteman,* 338 S.W.3d 804, 809 (Ky.App.2011). In reviewing a circuit court's grant of a summary judgment motion, we must ascertain "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft,* 916 S.W.2d 779, 781 (Ky.App.1996); CR 56.03.

■ Likewise, whether a person is protected by official immunity is a question of law reviewed *de novo. Rowan County v. Sloas,* 201 S.W.3d 469, 475 (Ky.2006).

## IV. *Analysis*

Appellants assert the circuit court erred in concluding they were not entitled to the protections of qualified official immunity because the acts in question are discretionary in nature. Specifically, Cantrell maintains he exercised discretion in deciding whether to admit Roberts to the Detention Center. Further, Coleman contends the Detention Center's policy requiring an inmate to be moved to a general population cell within four hours of arrival only applies to male inmates, not female inmates. Hence, Coleman contends he was afforded wide latitude and discretion in choosing not to move a female inmate from a holding cell to the general population.

In response, Smith argues Cantrell's actions were ministerial, rather than discretionary, because jail policy prohibits admitting an arrestee to the Detention Center if there is any evidence of a drug overdose. Likewise, Smith asserts Coleman's actions were ministerial, rather than discretionary, because jail policy prohibits an inmate from being held in a holding cell for more than four hours; after four hours, the inmate must be moved from the holding cell into the general population. In both situations, Smith contends, jail policy is specific, direct, and absolute leaving no room for discretion or personal judgment. Had appellants simply enforced known jail policies, Smith urges, Roberts' death would have been prevented.

■ " 'Official immunity' is immunity from tort liability afforded to public officers and employees for acts performed in the exercise of their discretionary functions[.]" *Yanero v. Davis,* 65 S.W.3d 510, 521 (Ky.2001). If a public officer or employee "is acting in a discretionary manner, in good faith, and within the scope of his employment," then he or she is entitled to the protections of qualified official immunity. *Nelson Co. Bd. of Educ. v. Forte,* 337 S.W.3d 617, 621 (Ky.2011).

> [W]hen an officer or employee of the state or county (or one of its agencies) is sued in his or her individual capacity, that officer or employee enjoys qualified official immunity, which affords protections from damages liability for good faith judgment calls made in a legally

uncertain environment. Application of the defense, therefore, rests not on the status or the title of the officer or employee, but on the [act or] function performed.

*Haney v. Monsky,* 311 S.W.3d 235, 240 (Ky.2010) (alteration in original; citations omitted). Because "qualified official immunity applies only where the act performed by the official or employee is one that is discretionary in nature," we must first classify "the particular acts or functions in question" as either discretionary or ministerial. *Id.; Forte,* 337 S.W.3d at 621 ("[I]t has always been the case that the negligent performance of a *ministerial* act by an official or employee enjoys *no* immunity[.]" (first emphasis added; second emphasis in original)).

■ Discretionary acts involve "the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Yanero,* 65 S.W.3d at 522. Such acts "require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." *Haney,* 311 S.W.3d at 240.

■ Conversely, "ministerial acts or functions—for which there are no immunity—are those that require 'only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.'" *Id.* (citing *Yanero,* 65 S.W.3d at 522). Simply because "a necessity may exist for the ascertainment of those [fixed and designated] facts does not operate to convert the [ministerial] act into one discretionary in its nature." *Upchurch v. Clinton County,* 330 S.W.2d 428, 430 (Ky. 1959).

■ Our Supreme Court has cautioned against the *ad hoc* application of these guidelines because "few acts are ever purely discretionary or purely ministerial." *Haney,* 311 S.W.3d at 240. Instead, "determining the nature of a particular act or function demands a more probing analysis" focusing on "the *dominant* nature of the act" or function at issue. *Id.* (emphasis in original).

■ In the case before us, Cantrell allegedly violated Policy 3–1 which provides, in pertinent part: "[n]o person shall be admitted to the Pike County Detention Center in an unconscious state or with any evidence of serious illness, injury, drug overdose or anyone with a reading over .30% blood alcohol content." Policy 3–1 is part ministerial and part discretionary.

Pursuant to Policy 3–1, if a person arrives at the Detention Center in an unconscious state or with a blood alcohol content greater than .30%, that person may not be admitted to the Detention Center. Independent thought and deliberation is not needed to comply with these parts of policy 3–1. Instead, once jail personnel are notified the arrestee is unconscious, or his or her blood alcohol level exceeds .30%, their "duty is absolute, certain, and imperative," *Haney,* 311 S.W.3d at 240, *i.e.,* the arrestee must be denied admission to the Detention Center. The policy-maker removed all discretion from the decision-making process by quantifying the event triggering the denial, namely an unconscious state or blood alcohol level over .30%. Compliance with this portion of policy 3–1 is ministerial.

Conversely, the remainder of Policy 3–1—prohibiting the admission of an arrestee if any evidence of a serious illness, injury, or drug overdose is present—is discretionary in nature. This criterion does not eliminate the need for discretionary decision-making. On the contrary, it requires the intake officer's qualitative assessment of whether the arrestee presents

discernable indicators of serious illness, injury, or drug overdose as distinguished from inebriation caused by the intemperate consumption of alcohol or drugs. This distinction is accomplished subjectively, by exercise of the intake officer's judgment—*i.e.*, by the exercise of discretion. *See Haney*, 311 S.W.3d at 243 (emphasizing a discretionary function or act "is largely subjective and left to the will or judgment of the performer" (internal quotation marks and citation omitted)). This portion of Policy 3–1 is discretionary in nature.

▪ In the case before us, Smith only contends Cantrell failed to comply with the discretionary portion of Policy 3–1. That is, Cantrell failed to perceive Roberts was exhibiting symptoms of a drug overdose. As aptly noted by the federal district court, Roberts' symptoms were not "atypical nor [did] they distinguish Roberts from the multitude of drug and alcohol abusers the jail admits every day. Fortunately, most, if not all, of those admitted 'sleep off' their intoxication. Unfortunately, Roberts did not." *Smith*, 2008 WL 3884331, at *12. Despite Roberts' death, we find Cantrell engaged in a discretionary act when he concluded Roberts was not suffering from a drug overdose.[6]

▪ While we have concluded Cantrell engaged in a discretionary act, we are unable to conclusively determine whether Cantrell is, in fact, entitled to immunity. As explained in *Yanero*, "[o]nce the officer or employee has shown prima-facie that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discre-

tionary act was not performed in good faith." 65 S.W.3d at 523. "[S]ubjective intent or good faith, is a factual question that so rarely can be decided by summary judgment ... and may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues, and normally requires a trial to resolve[.]" 201 S.W.3d at 474 (brackets omitted). Because whether an officer or employee acted in good faith is a question of fact, we remand to afford the circuit court an opportunity to receive evidence on this issue. *See Sloas*, 201 S.W.3d at 474.

On remand, Smith must put forth affirmative evidence that Cantrell failed to exercise good faith. If Smith is unable to sustain his burden, summary judgment in Cantrell's favor may be proper. Ultimately, once the material facts are fleshed out in discovery, the circuit court will then be prepared to determine, as a matter of law, whether Cantrell is protected by official immunity. *Id.* at 475. Of course, if genuine issues of material fact regarding Cantrell's good faith remain, those factual issues will be for the jury to determine.

▪ Turning to Coleman, Smith alleges Coleman violated Policy 3–4 addressing the relocation of inmates from the holding area to the general population. This policy provides, in relevant part: "3–4 Admitting Inmates to Population; Admitting Male Inmates to General Population; Policy: No Inmate will be held in booking area no longer [sic] than ... (4) hours in secure holdings cells 127, 129, and 130. All inmates will be admitted to general population." It is undisputed that Roberts was

---

6. It is essential to emphasize the issue before us is not whether Cantrell properly determined there was no evidence of a drug overdose, but instead whether that particular act was discretionary or ministerial. *See Sloas*, 201 S.W.3d at 483 ("[I]t is necessary to sepa-

rate out the material issues of fact which apply only to the plaintiff's claims (should they survive summary judgment), from those that are pertinent to the determination of 'qualified official immunity.'").

not moved to the general population, but remained in holding Cell 129 during her entire stay at the Detention Center from 12:30 p.m. to 9:00 p.m.

Smith contends that, had Coleman complied with Policy 3–4 by moving Roberts from Cell 129 and into the general population at or before the four hour point, Coleman would have realized Roberts was in medical distress and Roberts' death would have been prevented. Coleman's failure to enforce a known jail policy, Smith maintains, indicates that his duty was inherently ministerial for which he has no immunity. In support, Smith relies on *Yanero v. Davis*, 65 S.W.3d 510 (Ky.2001).

In *Yanero*, the Supreme Court held teachers assigned to supervise a school-sponsored baseball practice were not entitled to official immunity because the "enforcement of a known rule requiring that student athletes wear batting helmets during baseball batting practice" is a ministerial act. *Id.* at 529. Subsequently, in *Haney*, the Supreme Court emphasized the helmet rule in *Yanero* represented "an essentially objective and binary directive"; compliance therewith could not be a matter of degree. 311 S.W.3d at 242. "That is to say, the children were plainly wearing their helmets during batting practice or they were not." *Id.*

Applying *Yanero*, it is inescapable that, if Policy 3–4 governs this situation, then Coleman failed to carry out a ministerial duty.[7] Analogous to the helmet rule in *Yanero*, enforcement of Policy 3–4 involves the "mere[ ] execution of a specific act arising from fixed and designated facts[.]" 65 S.W.3d at 522. Once an inmate has been in a secure holding cell for four hours, he or she must be moved to the general population. Despite Policy 3–4's clear directive, Coleman failed to move

Roberts from holding Cell 129 to the general population after the four hour holding cell period expired. Coleman's inaction constitutes an "identifiable deviation from an 'absolute, certain, and imperative' obligation[.]" *Haney*, 311 S.W.3d at 245 (citation omitted).

However, Coleman argues that Policy 3–4 does not govern this situation because it applies only to *male* inmates, not female inmates. Roberts was a female inmate. Therefore, argues Coleman, he did not violate Policy 3–4 and there was no duty to move Roberts within the time period established for male inmates. Furthermore, so goes the argument, because no policy addresses when to move female inmates from the holding cell to the general population, when to do so was a matter of Coleman's discretion.

The resolution of this matter requires an interpretation of Policy 3–4. Similar to the interpretation of an insurance policy or statute, the interpretation of Policy 3–4 is a question of law. *See Peabody Painting & Waterproofing, Inc. v. Kentucky Employers' Mutual Ins. Co.*, 329 S.W.3d 684, 688 (Ky.App.2010) ("Interpretation of an insurance policy is a question of law[.]"); *Halls Hardwood Floor Co. v. Stapleton*, 16 S.W.3d 327, 330 (Ky.App. 2000) ("Statutory interpretation is a matter of law reserved for the courts."). General standards of statutory construction require that we not be guided by a single word or sentence of a statute but, instead, demand that we consider the statute, or in this case the Policy Manual, as a whole with an eye toward effectuating its object and purpose. *County of Harlan v. Appalachian Regional Healthcare, Inc.*, 85 S.W.3d 607, 611 (Ky.2002). As always, we

---

7. This leaves unresolved, and we do not address, whether the failure to satisfy this ministerial duty was the proximate cause of Roberts' death.

endeavor to give effect to and promote the intent of the policy maker. *See id.*

■ These rules of statutory construction guide our interpretation of Policy 3–4. Unfortunately, our review is obstructed by the fact that the record contains only bits and pieces of the Detention Center's Policy and Procedure Manual. Without the Manual in its entirety, we are unable to properly construe Policy 3–4 in the context of the whole; therefore, we cannot determine the intent of the Pike County Jailer in preparing the policies contained in the Manual.

On the one hand, the plain language of Policy 3–4 indicates it would be more appropriately placed in a general section applying to both male and female inmates because it states that *"No Inmate* [making no reference to gender] will be held in booking area no [sic] longer than ... (4) hours in secure holdings cells[.]" (emphasis added). On the other hand, this language appears under the heading "Admitting *Male* Inmates to General Population." (emphasis added).

Factual questions remain. Is there another policy that addresses the movement of female inmates from the holding cell to the general population? Is that policy identical to Policy 3–4? If so, Coleman will have failed to satisfy the ministerial duty established by that policy. If it is not identical to Policy 3–4, is there a non-arbitrary reason for applying Policy 3–4 only to male inmates.

If there is no non-arbitrary justification for treating female inmates differently than male inmates, Policy 3–4 must be presumed arbitrary and would thus fail to pass constitutional muster. *See* Ky. Const. § 2. As explained in *Kentucky Milk Marketing and Antimonopoly Com'n v. Kroger Co.,* 691 S.W.2d 893 (Ky.1985), "whatever is essentially unjust and unequal or exceeds the reasonable and legitimate interests of the people is arbitrary" under Section 2 of Kentucky's Constitution. *Id.* at 899. "No board or officer vested with governmental authority may exercise it arbitrarily." [8] *Id.; see also Smith v. O'Dea,* 939 S.W.2d 353, 357 (Ky.App.1997).

On its face, we are unable to discern a non-arbitrary reason for applying Policy 3–4 only to male inmates. However, because the "question of reasonableness is one of degree and must be based on the facts of a particular case," *Kroger,* 691 S.W.2d at 899, we must remand this issue to the circuit court for additional findings.

Upon remand, the circuit court must, at a minimum, determine: whether a separate policy addresses the movement of female inmates from the holding cell to the general population; whether Policy 3–4, despite its placement under the heading addressing male prisoners, was intended to govern female prisoners as well as male prisoners; and, whether there is a non-arbitrary reason for treating female and male prisoners differently when it comes to moving inmates from the holding cell to the general population. Based on those determinations, the circuit court will be able to determine whether Coleman's defense that the decision when to move female inmates from holding cells to the general population is a discretionary act.

---

**8.** Kentucky courts have interpreted Section 2's broad provisions as the state-level assurance—comparable to the 14th Amendment to the United States Constitution—of procedural due process and equal protection of the laws. *See Kroger Co.,* 691 S.W.2d at 899 ("Section 2 is broad enough to embrace the traditional concepts of both due process of law and equal protection of the law."). To that end, Section 2 is often invoked to curb arbitrary and capricious agency action or economic legislation where no other section of the Kentucky constitution provides direct relief.

### V. *Conclusion*

For the foregoing reasons, we reverse the Pike Circuit Court's June 28, 2011 order and remand for additional proceedings consistent with this opinion.

ALL CONCUR.